UNITED STATES *v.* UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
MICHIGAN ET AL. (PLAMONDON ET AL.,
REAL PARTIES IN INTEREST)

No. 70–153.   Argued February 24, 1972—Decided June 19, 1972

298

POWELL, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, STEWART, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 324. BURGER, C. J., concurred in the result. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 335. REHNQUIST, J., took no part in the consideration or decision of the case.

*Assistant Attorney General Mardian* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold* and *Robert L. Keuch.*

*William T. Gossett* argued the cause for respondents the United States District Court for the Eastern District of Michigan, et al. With him on the brief was *Abraham D. Sofaer. Arthur Kinoy* argued the cause for respondents Sinclair et al. With him on the brief were *William J. Bender* and *William Kunstler.*

Briefs of *amici curiae* urging affirmance were filed by *Stephen I. Schlossberg* for the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), and by *Benjamin Dreyfus* for the Black Panther Party et al.

Briefs of *amici curiae* were filed by *Herman Schwartz, Melvin L. Wulf,* and *Erwin B. Ellmann* for the American Civil Liberties Union et al.; by *John Ligtenberg* for the American Federation of Teachers; and by the American Friends Service Committee.

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue before us is an important one for the people of our country and their Government. It involves the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval. Successive Presidents for more than one-quarter of a century have authorized such surveillance in varying degrees,[1] without guidance from the Congress or a definitive decision of this Court. This case brings the issue here for the first time. Its resolution is a matter of national concern, requiring sensitivity both to the Government's right to protect itself from unlawful subversion and attack and to the citizen's right to be secure in his privacy against unreasonable Government intrusion.

This case arises from a criminal proceeding in the United States District Court for the Eastern District of Michigan, in which the United States charged three defendants with conspiracy to destroy Government property in violation of 18 U. S. C. § 371. One of the defendants, Plamondon, was charged with the dynamite bombing of an office of the Central Intelligence Agency in Ann Arbor, Michigan.

During pretrial proceedings, the defendants moved to compel the United States to disclose certain electronic

---

[1] See n. 10, *infra.*

surveillance information and to conduct a hearing to determine whether this information "tainted" the evidence on which the indictment was based or which the Government intended to offer at trial. In response, the Government filed an affidavit of the Attorney General, acknowledging that its agents had overheard conversations in which Plamondon had participated. The affidavit also stated that the Attorney General approved the wiretaps "to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." [2] The logs of the surveillance

---

[2] The Attorney General's affidavit reads as follows:

"JOHN N. MITCHELL being duly sworn deposes and says:

"1. I am the Attorney General of the United States.

"2. This affidavit is submitted in connection with the Government's opposition to the disclosure to the defendant Plamondon of information concerning the overhearing of his conversations which occurred during the course of electronic surveillances which the Government contends were legal.

"3. The defendant Plamondon has participated in conversations which were overheard by Government agents who were monitoring wiretaps which were being employed to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government. The records of the Department of Justice reflect the installation of these wiretaps had been expressly approved by the Attorney General.

"4. Submitted with this affidavit is a sealed exhibit containing the records of the intercepted conversations, a description of the premises that were the subjects of surveillances, and copies of the memoranda reflecting the Attorney General's express approval of the installation of the surveillances.

"5. I certify that it would prejudice the national interest to disclose the particular facts concerning these surveillances other than to the court *in camera*. Accordingly, the sealed exhibit referred to herein is being submitted solely for the court's *in camera* inspection and a copy of the sealed exhibit is not being furnished to the defendants. I would request the court, at the conclusion of its

were filed in a sealed exhibit for *in camera* inspection by the District Court.

On the basis of the Attorney General's affidavit and the sealed exhibit, the Government asserted that the surveillance was lawful, though conducted without prior judicial approval, as a reasonable exercise of the President's power (exercised through the Attorney General) to protect the national security. The District Court held that the surveillance violated the Fourth Amendment, and ordered the Government to make full disclosure to Plamondon of his overheard conversations. 321 F. Supp. 1074 (ED Mich. 1971).

The Government then filed in the Court of Appeals for the Sixth Circuit a petition for a writ of mandamus to set aside the District Court order, which was stayed pending final disposition of the case. After concluding that it had jurisdiction,[3] that court held that the surveillance was unlawful and that the District Court had properly required disclosure of the overheard conversations, 444 F. 2d 651 (1971). We granted certiorari, 403 U. S. 930.

I

Title III of the Omnibus Crime Control and Safe Streets Act, 18 U. S. C. §§ 2510–2520, authorizes the use of electronic surveillance for classes of crimes care-

---

hearing on this matter, to place the sealed exhibit in a sealed envelope and return it to the Department of Justice where it will be retained under seal so that it may be submitted to any appellate court that may review this matter."

[3] Jurisdiction was challenged before the Court of Appeals on the ground that the District Court's order was interlocutory and not appealable under 28 U. S. C. § 1291. On this issue, the court correctly held that it did have jurisdiction, relying upon the All Writs Act, 28 U. S. C. § 1651, and cases cited in its opinion, 444 F. 2d, at 655–656. No attack was made in this Court as to the appropriateness of the writ of mandamus procedure.

fully specified in 18 U. S. C. § 2516. Such surveillance is subject to prior court order. Section 2518 sets forth the detailed and particularized application necessary to obtain such an order as well as carefully circumscribed conditions for its use. The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression. Much of Title III was drawn to meet the constitutional requirements for electronic surveillance enunciated by this Court in *Berger* v. *New York*, 388 U. S. 41 (1967), and *Katz* v. *United States*, 389 U. S. 347 (1967).

Together with the elaborate surveillance requirements in Title III, there is the following proviso; 18 U. S. C. § 2511 (3):

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U. S. C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. *Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.* The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing,

or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power." (Emphasis supplied.)

The Government relies on § 2511 (3). It argues that "in excepting national security surveillances from the Act's warrant requirement Congress recognized the President's authority to conduct such surveillances without prior judicial approval." Brief for United States 7, 28. The section thus is viewed as a recognition or affirmance of a constitutional authority in the President to conduct warrantless domestic security surveillance such as that involved in this case.

We think the language of § 2511 (3), as well as the legislative history of the statute, refutes this interpretation. The relevant language is that:

"Nothing contained in this chapter . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect . . ."

against the dangers specified. At most, this is an implicit recognition that the President does have certain powers in the specified areas. Few would doubt this, as the section refers—among other things—to protection "against actual or potential attack or other hostile acts of a foreign power." But so far as the use of the President's electronic surveillance power is concerned, the language is essentially neutral.

Section 2511 (3) certainly confers no power, as the language is wholly inappropriate for such a purpose. It merely provides that the Act shall not be interpreted to limit or disturb such power as the President may have under the Constitution. In short, Congress simply left presidential powers where it found them. This view is reinforced by the general context of Title III. Section 2511 (1) broadly prohibits the use of electronic

surveillance "[e]xcept as otherwise specifically provided in this chapter." Subsection (2) thereof contains four specific exceptions. In each of the specified exceptions, the statutory language is as follows:

> "It shall not be unlawful . . . to intercept" the particular type of communication described.[4]

The language of subsection (3), here involved, is to be contrasted with the language of the exceptions set forth in the preceding subsection. Rather than stating that warrantless presidential uses of electronic surveillance "shall not be unlawful" and thus employing the standard language of exception, subsection (3) merely disclaims any intention to "limit the constitutional power of the President."

The express grant of authority to conduct surveillances is found in § 2516, which authorizes the Attorney General to make application to a federal judge when surveillance may provide evidence of certain offenses. These offenses are described with meticulous care and specificity.

Where the Act authorizes surveillance, the procedure to be followed is specified in § 2518. Subsection (1) thereof requires application to a judge of competent jurisdiction for a prior order of approval, and states in detail the information required in such application.[5]

---

[4] These exceptions relate to certain activities of communication common carriers and the Federal Communications Commission, and to specified situations where a party to the communication has consented to the interception.

[5] Title 18 U. S. C. § 2518, subsection (1), reads as follows:

"§ 2518. Procedure for interception of wire or oral communications

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction

Subsection (3) prescribes the necessary elements of probable cause which the judge must find before issuing an order authorizing an interception. Subsection (4) sets forth the required contents of such an order.

and shall state the applicant's authority to make such application. Each application shall include the following information:

"(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

"(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

"(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

"(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."

Subsection (5) sets strict time limits on an order. Provision is made in subsection (7) for "an emergency situation" found to exist by the Attorney General (or by the principal prosecuting attorney of a State) "with respect to conspiratorial activities threatening the national security interest." In such a situation, emergency surveillance may be conducted "if an application for an order approving the interception is made . . . within forty-eight hours." If such an order is not obtained, or the application therefor is denied, the interception is deemed to be a violation of the Act.

In view of these and other interrelated provisions delineating permissible interceptions of particular criminal activity upon carefully specified conditions, it would have been incongruous for Congress to have legislated with respect to the important and complex area of national security in a single brief and nebulous paragraph. This would not comport with the sensitivity of the problem involved or with the extraordinary care Congress exercised in drafting other sections of the Act. We therefore think the conclusion inescapable that Congress only intended to make clear that the Act simply did not legislate with respect to national security surveillances.[6]

The legislative history of § 2511 (3) supports this interpretation. Most relevant is the colloquy between Senators Hart, Holland, and McClellan on the Senate floor:

"Mr. HOLLAND. . . . The section [2511(3)] from which the Senator [Hart] has read does not affirma-

---

[6] The final sentence of § 2511 (3) states that the contents of an interception "by authority of the President in the exercise of the foregoing powers may be received in evidence . . . only where such interception was reasonable . . . ." This sentence seems intended to assure that when the President conducts lawful surveillance—pursuant to whatever power he may possess—the evidence is admissible.

tively give any power. . . . *We are not affirmatively conferring any power upon the President.* We are simply saying that nothing herein shall limit such power as the President has under the Constitution. . . . We certainly do not grant him a thing.

"There is nothing affirmative in this statement.

"Mr. McCLELLAN. Mr. President, *we make it understood that we are not trying to take anything away from him.*

"Mr. HOLLAND. The Senator is correct.

"Mr. HART. Mr. President, there is no intention here to expand by this language a constitutional power. Clearly we could not do so.

"Mr. McCLELLAN. Even though intended, we could not do so.

"Mr. HART. . . . However, we are agreed that this language should not be regarded as intending to grant any authority, including authority to put a bug on, that the President does not have now.

"In addition, Mr. President, *as I think our exchange makes clear, nothing in section 2511 (3) even attempts to define the limits of the President's national security power under present law,* which I have always found extremely vague . . . . *Section 2511(3) merely says that if the President has such a power, then its exercise is in no way affected by title III.*" [7]   (Emphasis supplied.)

---

[7] 114 Cong. Rec. 14751. Senator McClellan was the sponsor of the bill. The above exchange constitutes the only time that § 2511 (3) was expressly debated on the Senate or House floor. The Report of the Senate Judiciary Committee is not so explicit as the exchange on the floor, but it appears to recognize that under § 2511 (3) the national security power of the President—whatever it may be—"is not to be deemed disturbed." S. Rep. No. 1097, 90th Cong., 2d Sess., 94 (1968). See also The "National Security Wiretap": Presidential Prerogative or Judicial Responsibility, where the author concludes that in § 2511 (3) "Congress took what amounted to a position of

One could hardly expect a clearer expression of congressional neutrality. The debate above explicitly indicates that nothing in § 2511 (3) was intended to *expand* or to *contract* or to *define* whatever presidential surveillance powers existed in matters affecting the national security. If we could accept the Government's characterization of § 2511 (3) as a congressionally prescribed exception to the general requirement of a warrant, it would be necessary to consider the question of whether the surveillance in this case came within the exception and, if so, whether the statutory exception was itself constitutionally valid. But viewing § 2511 (3) as a congressional disclaimer and expression of neutrality, we hold that the statute is not the measure of the executive authority asserted in this case. Rather, we must look to the constitutional powers of the President.

## II

It is important at the outset to emphasize the limited nature of the question before the Court. This case raises no constitutional challenge to electronic surveillance as specifically authorized by Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Nor is there any question or doubt as to the necessity of obtaining a warrant in the surveillance of crimes unrelated to the national security interest. *Katz* v. *United States,* 389 U. S. 347 (1967); *Berger* v. *New York,* 388 U. S. 41 (1967). Further, the instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country. The Attorney General's affidavit in this case states that the surveillances were

neutral noninterference on the question of the constitutionality of warrantless national security wiretaps authorized by the President." 45 S. Cal. L. Rev. 888, 889 (1972).

"deemed necessary to protect the nation from attempts of *domestic organizations* to attack and subvert the existing structure of Government" (emphasis supplied). There is no evidence of any involvement, directly or indirectly, of a foreign power.[8]

Our present inquiry, though important, is therefore a narrow one. It addresses a question left open by *Katz, supra,* at 358 n. 23:

"Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security . . . ."

The determination of this question requires the essential Fourth Amendment inquiry into the "reasonableness" of the search and seizure in question, and the way in which that "reasonableness" derives content and mean-

---

[8] Section 2511 (3) refers to "the constitutional power of the President" in two types of situations: (i) where necessary to protect against attack, other hostile acts or intelligence activities of a "foreign power"; or (ii) where necessary to protect against the overthrow of the Government or other clear and present danger to the structure or existence of the Government. Although both of the specified situations are sometimes referred to as "national security" threats, the term "national security" is used only in the first sentence of § 2511 (3) with respect to the activities of foreign powers. This case involves only the second sentence of § 2511 (3), with the threat emanating—according to the Attorney General's affidavit—from "domestic organizations." Although we attempt no precise definition, we use the term "domestic organization" in this opinion to mean a group or organization (whether formally or informally constituted) composed of citizens of the United States and which has no significant connection with a foreign power, its agents or agencies. No doubt there are cases where it will be difficult to distinguish between "domestic" and "foreign" unlawful activities directed against the Government of the United States where there is collaboration in varying degrees between domestic groups or organizations and agents or agencies of foreign powers. But this is not such a case.

ing through reference to the warrant clause. *Coolidge* v. *New Hampshire*, 403 U. S. 443, 473–484 (1971).

We begin the inquiry by noting that the President of the United States has the fundamental duty, under Art. II, § 1, of the Constitution, to "preserve, protect and defend the Constitution of the United States." Implicit in that duty is the power to protect our Government against those who would subvert or overthrow it by unlawful means. In the discharge of this duty, the President—through the Attorney General—may find it necessary to employ electronic surveillance to obtain intelligence information on the plans of those who plot unlawful acts against the Government.[9] The use of such surveillance in internal security cases has been sanctioned more or less continuously by various Presidents and Attorneys General since July 1946.[10]

---

[9] Enactment of Title III reflects congressional recognition of the importance of such surveillance in combatting various types of crime. Frank S. Hogan, District Attorney for New York County for over 25 years, described telephonic interception, pursuant to court order, as "the single most valuable weapon in law enforcement's fight against organized crime." 117 Cong. Rec. 14051. The "Crime Commission" appointed by President Johnson noted that "[t]he great majority of law enforcement officials believe that the evidence necessary to bring criminal sanctions to bear consistently on the higher echelons of organized crime will not be obtained without the aid of electronic surveillance techniques. They maintain these techniques are indispensable to develop adequate strategic intelligence concerning organized crime, to set up specific investigations, to develop witnesses, to corroborate their testimony, and to serve as substitutes for them—each a necessary step in the evidence-gathering process in organized crime investigations and prosecutions." Report by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 201 (1967).

[10] In that month Attorney General Tom Clark advised President Truman of the necessity of using wiretaps "in cases vitally affecting the domestic security." In May 1940 President Roosevelt had au-

Herbert Brownell, Attorney General under President Eisenhower, urged the use of electronic surveillance both in internal and international security matters on the grounds that those acting against the Government

> "turn to the telephone to carry on their intrigue. The success of their plans frequently rests upon piecing together shreds of information received from many sources and many nests. The participants in the conspiracy are often dispersed and stationed in various strategic positions in government and industry throughout the country." [11]

Though the Government and respondents debate their seriousness and magnitude, threats and acts of sabotage against the Government exist in sufficent number to justify investigative powers with respect to them.[12] The covertness and complexity of potential unlawful con-

---

thorized Attorney General Jackson to utilize wiretapping in matters "involving the defense of the nation," but it is questionable whether this language was meant to apply to solely domestic subversion. The nature and extent of wiretapping apparently varied under different administrations and Attorneys General, but, except for the sharp curtailment under Attorney General Ramsey Clark in the latter years of the Johnson administration, electronic surveillance has been used both against organized crime and in domestic security cases at least since the 1946 memorandum from Clark to Truman. Brief for United States 16–18; Brief for Respondents 51–56; 117 Cong. Rec. 14056.

[11] Brownell, The Public Security and Wire Tapping, 39 Cornell L. Q. 195, 202 (1954). See also Rogers, The Case For Wire Tapping, 63 Yale L. J. 792 (1954).

[12] The Government asserts that there were 1,562 bombing incidents in the United States from January 1, 1971, to July 1, 1971, most of which involved Government related facilities. Respondents dispute these statistics as incorporating many frivolous incidents as well as bombings against nongovernmental facilities. The precise level of this activity, however, is not relevant to the disposition of this case. Brief for United States 18; Brief for Respondents 26–29; Reply Brief for United States 13.

duct against the Government and the necessary dependency of many conspirators upon the telephone make electronic surveillance an effective investigatory instrument in certain circumstances. The marked acceleration in technological developments and sophistication in their use have resulted in new techniques for the planning, commission, and concealment of criminal activities. It would be contrary to the public interest for Government to deny to itself the prudent and lawful employment of those very techniques which are employed against the Government and its law-abiding citizens.

It has been said that "[t]he most basic function of any government is to provide for the security of the individual and of his property." *Miranda* v. *Arizona,* .384 U. S. 436, 539 (1966) (WHITE, J., dissenting). And unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered. As Chief Justice Hughes reminded us in *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941):

> "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."

But a recognition of these elementary truths does not make the employment by Government of electronic surveillance a welcome development—even when employed with restraint and under judicial supervision. There is, understandably, a deep-seated uneasiness and apprehension that this capability will be used to intrude upon cherished privacy of law-abiding citizens.[13] We

---

[13] Professor Alan Westin has written on the likely course of future conflict between the value of privacy and the "new technology" of law enforcement. Much of the book details techniques

look to the Bill of Rights to safeguard this privacy. Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance. *Katz* v. *United States, supra; Berger* v. *New York, supra; Silverman* v. *United States,* 365 U. S. 505 (1961). Our decision in *Katz* refused to lock the Fourth Amendment into instances of actual physical trespass. Rather, the Amendment governs "not only the seizure of tangible items, but extends as well to the recording of oral statements . . . without any 'technical trespass under . . . local property law.'" *Katz, supra,* at 353. That decision implicitly recognized that the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails [14] necessitate the application of Fourth Amendment safeguards.

National security cases, moreover, often reflect a convergence of First and Fourth Amendment values not present in cases of "ordinary" crime. Though the investigative duty of the executive may be stronger in such cases, so also is there greater jeopardy to constitutionally protected speech. "Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure

---

of physical and electronic surveillance and such possible threats to personal privacy as psychological and personality testing and electronic information storage and retrieval. Not all of the contemporary threats to privacy emanate directly from the pressures of crime control. Privacy and Freedom (1967).

[14] Though the total number of intercepts authorized by state and federal judges pursuant to Tit. III of the 1968 Omnibus Crime Control and Safe Streets Act was 597 in 1970, each surveillance may involve interception of hundreds of different conversations. The average intercept in 1970 involved 44 people and 655 conversations, of which 295 or 45% were incriminating. 117 Cong. Rec. 14052.

power," *Marcus* v. *Search Warrant*, 367 U. S. 717, 724 (1961). History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect "domestic security." Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent. Senator Hart addressed this dilemma in the floor debate on § 2511 (3):

> "As I read it—and this is my fear—we are saying that the President, on his motion, could declare— name your favorite poison—draft dodgers, Black Muslims, the Ku Klux Klan, or civil rights activists to be a clear and present danger to the structure or existence of the Government." [15]

The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power. Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation. For private dissent, no less than open public discourse, is essential to our free society.

### III

As the Fourth Amendment is not absolute in its terms, our task is to examine and balance the basic values at stake in this case: the duty of Government

---

[15] 114 Cong. Rec. 14750. The subsequent assurances, quoted in part I of the opinion, that § 2511 (3) implied no statutory grant, contraction, or definition of presidential power eased the Senator's misgivings.

to protect the domestic security, and the potential danger posed by unreasonable surveillance to individual privacy and free expression. If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. We must also ask whether a warrant requirement would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it.

Though the Fourth Amendment speaks broadly of "unreasonable searches and seizures," the definition of "reasonableness" turns, at least in part, on the more specific commands of the warrant clause. Some have argued that "[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable," *United States* v. *Rabinowitz*, 339 U. S. 56, 66 (1950).[16] This view, however, overlooks the second clause of the Amendment. The warrant clause of the Fourth Amendment is not dead language. Rather, it has been

> "a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should

---

[16] This view has not been accepted. In *Chimel* v. *California*, 395 U. S. 752 (1969), the Court considered the Government's contention that the search be judged on a general "reasonableness" standard without reference to the warrant clause. The Court concluded that argument was "founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point." *Id.,* at 764–765.

-be, an important working part of our machinery
of government, operating as a matter of course to
check the 'well-intentioned but mistakenly over-
zealous executive officers' who are a part of any
system of law enforcement." *Coolidge* v. *New Hamp-
shire,* 403 U. S., at 481.

See also *United States* v. *Rabinowitz, supra,* at 68
(Frankfurter, J., dissenting); *Davis* v. *United States,*
328 U. S. 582, 604 (1946) (Frankfurter, J., dissenting).

Over two centuries ago, Lord Mansfield held that
common-law principles prohibited warrants that ordered
the arrest of unnamed individuals who the *officer* might
conclude were guilty of seditious libel. "It is not fit,"
said Mansfield, "that the receiving or judging of the
information should be left to the discretion of the
officer. The magistrate ought to judge; and should
give certain directions to the officer." *Leach.* v. *Three
of the King's Messengers,* 19 How. St. Tr. 1001, 1027
(1765).

Lord Mansfield's formulation touches the very heart
of the Fourth Amendment directive: that, where prac-
tical, a governmental search and seizure should repre-
sent both the efforts of the officer to gather evidence
of wrongful acts and the judgment of the magistrate
that the collected evidence is sufficient to justify inva-
sion of a citizen's private premises or conversation. In-
herent in the concept of a warrant is its issuance by a
"neutral and detached magistrate." *Coolidge* v. *New
Hampshire, supra,* at 453; *Katz* v. *United States, supra,*
at 356. The further requirement of "probable cause"
instructs the magistrate that baseless searches shall not
proceed.

These Fourth Amendment freedoms cannot properly
be guaranteed if domestic security surveillances may
be conducted solely within the discretion of the Execu-

tive Branch. The Fourth Amendment does not con-
template the executive officers of Government as neutral
and disinterested magistrates. Their duty and responsi-
bility are to enforce the laws, to investigate, and to
prosecute. *Katz* v. *United States, supra,* at 359–360
(Douglas, J., concurring). But those charged with this
investigative and prosecutorial duty should not be the
sole judges of when to utilize constitutionally sensitive
means in pursuing their tasks. The historical judgment,
which the Fourth Amendment accepts, is that unreviewed
executive discretion may yield too readily to pressures
to obtain incriminating evidence and overlook potential
invasions of privacy and protected speech.[17]

It may well be that, in the instant case, the Govern-
ment's surveillance of Plamondon's conversations was a
reasonable one which readily would have gained prior
judicial approval. But this Court "has never sustained
a search upon the sole ground that officers reasonably
expected to find evidence of a particular crime and
voluntarily confined their activities to the least intru-
sive means consistent with that end." *Katz, supra,*
at 356–357. The Fourth Amendment contemplates a
prior judicial judgment,[18] not the risk that executive dis-
cretion may be reasonably exercised. This judicial role
accords with our basic constitutional doctrine that in-
dividual freedoms will best be preserved through a
separation of powers and division of functions among
the different branches and levels of Government. Har-
lan, Thoughts at a Dedication: Keeping the Judicial
Function in Balance, 49 A. B. A. J. 943–944 (1963).
The independent check upon executive discretion is not

---

[17] N. Lasson, The History and Development of the Fourth Amend-
ment to the United States Constitution 79–105 (1937).

[18] We use the word "judicial" to connote the traditional Fourth
Amendment requirement of a neutral and detached magistrate.

satisfied, as the Government argues, by "extremely limited" post-surveillance judicial review.[19]  Indeed, post-surveillance review would never reach the surveillances which failed to result in prosecutions.  Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights.  *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964).

It is true that there have been some exceptions to the warrant requirement.  *Chimel* v. *California,* 395 U. S. 752 (1969); *Terry* v. *Ohio,* 392 U. S. 1 (1968); *McDonald* v. *United States,* 335 U. S. 451 (1948); *Carroll* v. *United States,* 267 U. S. 132 (1925).  But those exceptions are few in number and carefully delineated, *Katz, supra,* at 357; in general, they serve the legitimate needs of law enforcement officers to protect their own well-being and preserve evidence from destruction.  Even while carving out those exceptions, the Court has re-affirmed the principle that the "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," *Terry* v. *Ohio, supra,* at 20; *Chimel* v. *California, supra,* at 762.

The Government argues that the special circumstances applicable to domestic security surveillances necessitate a further exception to the warrant requirement.  It is urged that the requirement of prior judicial review would obstruct the President in the discharge of his constitutional duty to protect domestic security.  We are told further that these surveillances are directed primarily to the collecting and maintaining of intelligence with

---

[19] The Government argues that domestic security wiretaps should be upheld by courts in post-surveillance review "[u]nless it appears that the Attorney General's determination that the proposed surveillance relates to a national security matter is arbitrary and capricious, *i. e.,* that it constitutes a clear abuse of the broad discretion that the Attorney General has to obtain all information that will be helpful to the President in protecting the Government . . ." against the various unlawful acts in § 2511(3).  Brief for United States 22.

respect to subversive forces, and are not an attempt to gather evidence for specific criminal prosecutions. It is said that this type of surveillance should not be subject to traditional warrant requirements which were established to govern investigation of criminal activity, not ongoing intelligence gathering. Brief for United States 15–16, 23–24; Reply Brief for United States 2–3.

The Government further insists that courts "as a practical matter would have neither the knowledge nor the techniques necessary to determine whether there was probable cause to believe that surveillance was necessary to protect national security." These security problems, the Government contends, involve "a large number of complex and subtle factors" beyond the competence of courts to evaluate. Reply Brief for United States 4.

As a final reason for exemption from a warrant requirement, the Government believes that disclosure to a magistrate of all or even a significant portion of the information involved in domestic security surveillances "would create serious potential dangers to the national security and to the lives of informants and agents. . . . Secrecy is the essential ingredient in intelligence gathering; requiring prior judicial authorization would create a greater 'danger of leaks . . . , because in addition to the judge, you have the clerk, the stenographer and some other officer like a law assistant or bailiff who may be apprised of the nature' of the surveillance." Brief for United States 24–25.

These contentions in behalf of a complete exemption from the warrant requirement, when urged on behalf of the President and the national security in its domestic implications, merit the most careful consideration. We certainly do not reject them lightly, especially at a time of worldwide ferment and when civil disorders in this country are more prevalent than in the less turbulent

periods of our history. There is, no doubt, pragmatic force to the Government's position.

But we do not think a case has been made for the requested departure from Fourth Amendment standards. The circumstances described do not justify complete exemption of domestic security surveillance from prior judicial scrutiny. Official surveillance, whether its purpose be criminal investigation or ongoing intelligence gathering, risks infringement of constitutionally protected privacy of speech. Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent. We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold that this requires an appropriate prior warrant procedure.

We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases. Certainly courts can recognize that domestic security surveillance involves different considerations from the surveillance of "ordinary crime." If the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance.

Nor do we believe prior judicial approval will fracture the secrecy essential to official intelligence gathering. The investigation of criminal activity has long

involved imparting sensitive information to judicial officers who have respected the confidentialities involved. Judges may be counted upon to be especially conscious of security requirements in national security cases. Title III of the Omnibus Crime Control and Safe Streets Act already has imposed this responsibility on the judiciary in connection with such crimes as espionage, sabotage, and treason, §§ 2516 (1)(a) and (c), each of which may involve domestic as well as foreign security threats. Moreover, a warrant application involves no public or adversary proceedings: it is an *ex parte* request before a magistrate or judge. Whatever security dangers clerical and secretarial personnel may pose can be minimized by proper administrative measures, possibly to the point of allowing the Government itself to provide the necessary clerical assistance.

Thus, we conclude that the Government's concerns do not justify departure in this case from the customary Fourth Amendment requirement of judicial approval prior to initiation of a search or surveillance. Although some added burden will be imposed upon the Attorney General, this inconvenience is justified in a free society to protect constitutional values. Nor do we think the Government's domestic surveillance powers will be impaired to any significant degree. A prior warrant establishes presumptive validity of the surveillance and will minimize the burden of justification in post-surveillance judicial review. By no means of least importance will be the reassurance of the public generally that indiscriminate wiretapping and bugging of law-abiding citizens cannot occur.

IV

We emphasize, before concluding this opinion, the scope of our decision. As stated at the outset, this case involves only the domestic aspects of national security. We have not addressed, and express no opinion

as to, the issues which may be involved with respect to activities of foreign powers or their agents.[20] Nor does our decision rest on the language of § 2511 (3) or any other section of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. That Act does not attempt to define or delineate the powers of the President to meet domestic threats to the national security.

Moreover, we do not hold that the same type of standards and procedures prescribed by Title III are necessarily applicable to this case. We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of "ordinary crime." The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information. The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crime specified in Title III. Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency. Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.

Given these potential distinctions between Title III criminal surveillances and those involving the domestic security, Congress may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III. Different standards may be compatible with the Fourth Amend-

---

[20] See n. 8, *supra*. For the view that warrantless surveillance, though impermissible in domestic security cases, may be constitutional where foreign powers are involved, see *United States* v. *Smith*, 321 F. Supp. 424, 425–426 (CD Cal. 1971); and American Bar Association Project on Standards for Criminal Justice, Electronic Surveillance 120, 121 (Approved Draft 1971, and Feb. 1971 Supp. 11). See also *United States* v. *Clay*, 430 F. 2d 165 (CA5 1970).

ment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection. As the Court said in *Camara* v. *Municipal Court*, 387 U. S. 523, 534–535 (1967):

> "In cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness. . . . In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code enforcement."

It may be that Congress, for example, would judge that the application and affidavit showing probable cause need not follow the exact requirements of § 2518 but should allege other circumstances more appropriate to domestic security cases; that the request for prior court authorization could, in sensitive cases, be made to any member of a specially designated court (*e. g.*, the District Court for the District of Columbia or the Court of Appeals for the District of Columbia Circuit); and that the time and reporting requirements need not be so strict as those in § 2518.

The above paragraph does not, of course, attempt to guide the congressional judgment but rather to delineate the present scope of our own opinion. We do not attempt to detail the precise standards for domestic security warrants any more than our decision in *Katz* sought to set the refined requirements for the specified criminal surveillances which now constitute Title III. We do

hold, however, that prior judicial approval is required for the type of domestic security surveillance involved in this case and that such approval may be made in accordance with such reasonable standards as the Congress may prescribe.

## V

As the surveillance of Plamondon's conversations was unlawful, because conducted without prior judicial approval, the courts below correctly held that *Alderman v. United States*, 394 U. S. 165 (1969), is controlling and that it requires disclosure to the accused of his own impermissibly intercepted conversations. As stated in *Alderman*, "the trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." 394 U. S., at 185.[21]

The judgment of the Court of Appeals is hereby

*Affirmed.*

THE CHIEF JUSTICE concurs in the result.

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

While I join in the opinion of the Court, I add these words in support of it.

This is an important phase in the campaign of the police and intelligence agencies to obtain exemptions from the Warrant Clause of the Fourth Amendment. For, due to the clandestine nature of electronic eavesdropping, the need is acute for placing on the Govern-

---

[21] We think it unnecessary at this time and on the facts of this case to consider the arguments advanced by the Government for a re-examination of the basis and scope of the Court's decision in *Alderman.*

ment the heavy burden to show that "exigencies of the situation [make its] course imperative."[1] Other abuses, such as the search incident to arrest, have been partly deterred by the threat of damage actions against offending officers,[2] the risk of adverse publicity, or the possibility of reform through the political process. These latter safeguards, however, are ineffective against lawless wiretapping and "bugging" of which their victims are totally unaware. Moreover, even the risk of exclusion of tainted evidence would here appear to be of negligible deterrent value inasmuch as the United States frankly concedes that the primary purpose of these searches is to fortify its intelligence collage rather than to accumulate evidence to support indictments and convictions. If the Warrant Clause were held inapplicable here, then the federal intelligence machine would literally enjoy unchecked discretion.

Here, federal agents wish to rummage for months on end through every conversation, no matter how intimate or personal, carried over selected telephone lines, simply to seize those few utterances which may add to their sense of the pulse of a domestic underground.

We are told that one national security wiretap lasted for 14 months and monitored over 900 conversations. Senator Edward Kennedy found recently that "warrantless devices accounted for an average of 78 to 209 days of listening per device, as compared with a 13-day per device average for those devices installed under court order."[3] He concluded that the Government's

---

[1] *Coolidge* v. *New Hampshire,* 403 U. S. 443, 455; *McDonald* v. *United States,* 335 U. S. 451, 456; *Chimel* v. *California,* 395 U. S. 752; *United States* v. *Jeffers,* 342 U. S. 48, 51.

[2] See *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U. S. 388.

[3] Letter from Senator Edward Kennedy to Members of the Subcommittee on Administrative Procedure and Practice of the Senate Judiciary Committee, Dec. 17, 1971, p. 2. Senator Kennedy included

revelations posed "the frightening possibility that the conversations of untold thousands of citizens of this country are being monitored on secret devices which no judge has authorized and which may remain in operation for months and perhaps years at a time." [4] Even the most innocent and random caller who uses or telephones into a tapped line can become a flagged number in the Government's data bank. See *Laird* v. *Tatum,* 1971 Term, No. 71–288.

Such gross invasions of privacy epitomize the very evil to which the Warrant Clause was directed. This Court has been the unfortunate witness to the hazards of police intrusions which did not receive prior sanction by independent magistrates. For example, in *Weeks* v. *United States,* 232 U. S. 383; *Mapp* v. *Ohio,* 367 U. S. 643; and *Chimel* v. *California,* 395 U. S. 752, entire homes were ransacked pursuant to warrantless searches. Indeed, in *Kremen* v. *United States,* 353 U. S. 346, the *entire contents* of a cabin, totaling more than 800 items (such as "1 Dish Rag") [5] were seized incident to an arrest of its occupant and were taken to San Francisco for study by FBI agents. In a similar case, *Von Cleef* v. *New*

in his letter a chart comparing court-ordered and department-ordered wiretapping and bugging by federal agencies. This chart is reproduced in the Appendix to this opinion. For a statistical breakdown by duration, location, and implementing agency of the 1,042 wiretap orders issued in 1971 by state and federal judges, see Administrative Office of the United States Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications for 1971; The Washington Post, May 14, 1972, p. A30, col. 1 (final ed.).

[4] Kennedy, *supra,* n. 3, at 2. See also H. Schwartz, A Report on the Costs and Benefits of Electronic Surveillance (American Civil Liberties Union 1971); Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order," 67 Mich. L. Rev. 455 (1969).

[5] For a complete itemization of the objects seized, see the Appendix to *Kremen* v. *United States,* 353 U. S. 346, 349.

*Jersey,* 395 U. S. 814, police, without a warrant, searched an arrestee's house for three hours, eventually seizing "several thousand articles, including books, magazines, catalogues, mailing lists, private correspondence (both open and unopened), photographs, drawings, and film." *Id.,* at 815. In *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, federal agents "without a shadow of authority" raided the offices of one of the petitioners (the proprietors of which had earlier been jailed) and "made a clean sweep of all the books, papers and documents found there." Justice Holmes, for the Court, termed this tactic an "outrage." *Id.,* at 390, 391. In *Stanford* v. *Texas,* 379 U. S. 476, state police seized more than 2,000 items of literature, including the writings of Mr. Justice Black, pursuant to a general search warrant issued to inspect an alleged subversive's home.

That "domestic security" is said to be involved here does not draw this case outside the mainstream of Fourth Amendment law. Rather, the recurring desire of reigning officials to employ dragnet techniques to intimidate their critics lies at the core of that prohibition. For it was such excesses as the use of general warrants and the writs of assistance that led to the ratification of the Fourth Amendment. In *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807, decided in 1765, one finds a striking parallel to the executive warrants utilized here. The Secretary of State had issued general executive warrants to his messengers authorizing them to roam about and to seize libelous material and libellants of the sovereign. Entick, a critic of the Crown, was the victim of one such general search during which his seditious publications were impounded. He brought a successful damage action for trespass against the messengers. The verdict was sustained on appeal. Lord Camden wrote that if such sweeping tactics were validated, then "the secret cabinets and bureaus of every

subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even to suspect, a person to be the author, printer, or publisher of a seditious libel." *Id.*, at 1063. In a related and similar proceeding, *Huckle* v. *Money,* 2 Wils. K. B. 206, 207, 95 Eng. Rep. 768, 769 (1763), the same judge who presided over Entick's appeal held for another victim of the same despotic practice, saying "[t]o enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition . . . ." See also *Wilkes* v. *Wood,* 19 How. St. Tr. 1153, 98 Eng. Rep. 489 (1763). As early as *Boyd* v. *United States,* 116 U. S. 616, 626, and as recently as *Stanford* v. *Texas, supra,* at 485–486; *Berger* v. *New York,* 388 U. S. 41, 49–50; and *Coolidge* v. *New Hampshire, supra,* at 455 n. 9, the tyrannical invasions described and assailed in *Entick, Huckle,* and *Wilkes,* practices which also were endured by the colonists,[6] have been rec-

---

[6] "On this side of the Atlantic, the argument concerning the validity of general search warrants centered around the writs of assistance which were used by customs officers for the detection of smuggled goods." N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51 (1937). In February 1761, all writs expired six months after the death of George II and Boston merchants petitioned the Superior Court in opposition to the granting of any new writs. The merchants were represented by James Otis, Jr., who later became a leader in the movement for independence.

"Otis completely electrified the large audience in the court room with his denunciation of England's whole policy toward the Colonies and with his argument against general warrants. John Adams, then a young man less than twenty-six years of age and not yet admitted to the bar, was a spectator, and many years later described the scene in these oft-quoted words: 'I do say in the most solemn manner, that Mr. Otis's oration against the Writs of Assistance breathed into this nation the breath of life.' He 'was a flame of fire! Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against Writs of Assistance. Then and there was the

ognized as the primary abuses which ensured the Warrant Clause a prominent place in our Bill of Rights. See J. Landynski, Search and Seizure and the Supreme Court 28–48 (1966). N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 43–78 (1937); Note, Warrantless Searches In Light of *Chimel*: A Return To The Original Understanding, 11 Ariz. L. Rev. 457, 460–476 (1969).

As illustrated by a flood of cases before us this Term, e. g., *Laird* v. *Tatum*, No. 71–288; *Gelbard* v. *United States*, No. 71–110; *United States* v. *Egan*, No. 71–263; *United States* v. *Caldwell*, No. 70–57; *United States* v. *Gravel*, No. 71–1026; *Kleindienst* v. *Mandel*, No. 71–16; we are currently in the throes of another national seizure of paranoia, resembling the hysteria which surrounded the Alien and Sedition Acts, the Palmer Raids, and the McCarthy era. Those who register dissent or who petition their governments for redress are subjected to scrutiny by grand juries,[7] by the FBI,[8] or even by the military.[9] Their associates are in-

---

first scene of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born. In 15 years, namely in 1776, he grew to manhood, and declared himself free.' " *Id.*, at 58–59.

[7] See Donner & Cerruti, The Grand Jury Network: How the Nixon Administration Has Secretly Perverted A Traditional Safeguard Of Individual Rights, 214 The Nation 5 (1972). See also *United States* v. *Caldwell*, O. T. 1971, No. 70–57; *United States* v. *Gravel*, O. T. 1971, No. 71–1026; *Gelbard* v. *United States* and *United States* v. *Egan*, O. T. 1971, Nos. 71–110 and 71–263. And see N. Y. Times, July 15, 1971, p. 6, col. 1 (grand jury investigation of N. Y. Times staff which published the Pentagon Papers).

[8] *E. g.*, N. Y. Times, April 12, 1970, p. 1, col. 2 ("U. S. To Tighten Surveillance of Radicals"); N. Y. Times, Dec. 14, 1969, p. 1, col. 1 ("F. B. I.'s Informants and Bugs Collect Data On Black Panthers"); the Washington Post, May 12, 1972, p. D21, col. 5 ("When the FBI Calls, Everybody Talks"); the Washington Post,

terrogated. Their homes are bugged and their telephones are wiretapped. They are befriended by secret government informers.[10] Their patriotism and loyalty are ques-

---

May 16, 1972, p. B15, col. 5 ("Black Activists Are FBI Targets"); the Washington Post, May 17, 1972, p. B13, col. 5 ("Bedroom Peeking Sharpens FBI Files"). And, concerning an FBI investigation of Daniel Schorr, a television correspondent critical of the Government, see N. Y. Times, Nov. 11, 1971, p. 95, col. 4; and N. Y. Times, Nov. 12, 1971, p. 13, col. 1. For the wiretapping and bugging of Dr. Martin Luther King by the FBI, see V. Navasky, Kennedy Justice. 135–155 (1971). For the wiretapping of Mrs. Eleanor Roosevelt and John L. Lewis by the FBI see Theoharis & Meyer, The "National Security" Justification For Electronic Eavesdropping: An Elusive Exception, 14 Wayne L. Rev. 749, 760–761 (1968).

[9] See *Laird* v. *Tatum*, O. T. 1971, No. 71–288; see also Federal Data Banks, Computers and the Bill of Rights, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971); N. Y. Times, Feb. 29, 1972, p. 1, col. 3.

[10] "Informers have been used for national security reasons throughout the twentieth century. They were deployed to combat what was perceived to be an internal threat from radicals during the early 1920's. When fears began to focus on Communism, groups thought to have some connection with the Communist Party were heavily infiltrated. Infiltration of the Party itself was so intense that one former FBI agent estimated a ratio of one informant for every 5.7 members in 1962. More recently, attention has shifted to militant antiwar and civil rights groups. In part because of support for such groups among university students throughout the country, informers seem to have become ubiquitous on campus. Some insight into the scope of the current use of informers was provided by the Media Papers, FBI documents stolen in early 1971 from a Bureau office in Media, Pennsylvania. The papers disclose FBI attempts to infiltrate a conference of war resisters at Haverford College in August 1969, and a convention of the National Association of Black Students in June 1970. They also reveal FBI endeavors 'to recruit informers, ranging from bill collectors to apartment janitors, in an effort to develop constant surveillance in black communities and New Left organizations' [N. Y. Times, April 8, 1971, p. 22, col. 1]. In Philadelphia's black community, for instance, a whole range of buildings 'including offices of the Congress

tioned.[11]   Senator Sam Ervin, who has chaired hearings on military surveillance of civilian dissidents, warns that "it is not an exaggeration to talk in terms of hundreds of thousands of . . . dossiers."[12]   Senator Kennedy, as mentioned *supra,* found "the frightening possibility that the conversations of untold thousands are being monitored on secret devices."   More than our privacy is implicated.   Also at stake is the reach of the Government's power to intimidate its critics.

When the Executive attempts to excuse these tactics as essential to its defense against internal subversion, we are obliged to remind it, without apology, of this Court's long commitment to the preservation of the Bill of Rights from the corrosive environment of precisely such expedi-

of Racial Equality, the Southern Christian Leadership Conference [and] the Black Coalition' [*ibid.*] was singled out for surveillance by building employees and other similar informers working for the FBI."   Note, Developments In The Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1272–1273 (1972).   For accounts of the impersonation of journalists by police, FBI agents and soldiers in order to gain the confidences of dissidents, see Press Freedoms Under Pressure, Report of the Twentieth Century Fund Task Force on the Government and the Press 29–34, 86–97 (1972).   For the revelation of Army infiltration of political organizations and spying on Senators, Governors and Congressmen, see Federal Data Banks, Computers and the Bill of Rights, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971) (discussed in my dissent from the denial of certiorari in *Williamson* v. *United States,* 405 U. S. 1026).   Among the Media Papers was the suggestion by the FBI that investigation of dissidents be stepped up in order to " 'enhance the paranoia endemic in these circles and [to] further serve to get the point across there is an FBI agent behind every mailbox.' "   N. Y. Times, March 25, 1971, p. 33, col. 1.

[11] *E. g.,* N. Y. Times, Feb. 8, 1972, p. 1, col. 8 (Senate peace advocates said, by presidential adviser, to be aiding and abetting the enemy).

[12] *Amicus curiae* brief submitted by Senator Sam Ervin in *Laird* v. *Tatum,* No. 71–288, O. T. 1971, p. 8.

ents.[13] As Justice Brandeis said, concurring in *Whitney v. California*, 274 U. S. 357, 377: "Those who won our independence by revo'ition were not cowards. They did not fear political change. They did not exalt order at the cost of liberty." Chief Justice Warren put it this way in *United States v. Robel*, 389 U. S. 258, 264: "[T]his concept of 'national defense' cannot be deemed an end in itself, justifying any . . . power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideas which set this Nation apart. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of . . . those liberties . . . which [make] the defense of the Nation worthwhile."

The Warrant Clause has stood as a barrier against intrusions by officialdom into the privacies of life. But if that barrier were lowered now to permit suspected subversives' most intimate conversations to be pillaged then why could not their abodes or mail be secretly searched by the same authority? To defeat so terrifying a claim of inherent power we need only stand by the enduring values served by the Fourth Amendment. As we stated last Term in *Coolidge v. New Hampshire*, 403 U. S. 443, 455: "In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law

---

[13] *E. g., New York Times Co.* v. *United States*, 403 U. S. 713; *Powell* v. *McCormack*, 395 U. S. 486; *United States* v. *Robel*, 389 U. S. 258, 264; *Aptheker* v. *Secretary of State*, 378 U. S. 500; *Baggett* v. *Bullitt*, 377 U. S. 360; *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579; *Duncan* v. *Kahanamoku*, 327 U. S. 304; *White* v. *Steer*, 327 U. S. 304; *De Jonge* v. *Oregon*, 299 U. S. 353, 365; *Ex parte Milligan*, 4 Wall. 2; *Mitchell* v. *Harmony*, 13 How. 115. Note, The "National Security Wiretap": Presidential Prerogative or Judicial Responsibility, 45 S. Cal. L. Rev. 888, 907–912 (1972).

and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won . . . a right of personal security against arbitrary intrusions . . . . If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important." We have as much or more to fear from the erosion of our sense of privacy and independence by the omnipresent electronic ear of the Government as we do from the likelihood that fomenters of domestic upheaval will modify our form of governing.[14]

---

[14] I continue in my belief that it would be extremely difficult to write a search warrant specifically naming the particular conversations to be seized and therefore any such attempt would amount to a general warrant, the very abuse condemned by the Fourth Amendment. As I said, dissenting in *Osborn* v. *United States,* 385 U. S. 323, 353: "Such devices lay down a dragnet which indiscriminately sweeps in all conversations within its scope, without regard to the nature of the conversations, or the participants. A warrant authorizing such devices is no different from the general warrants the Fourth Amendment was intended to prohibit."

## APPENDIX TO OPINION OF DOUGLAS, J., CONCURRING

### FEDERAL WIRETAPPING AND BUGGING 1969–1970

| | Court Ordered Devices | | Executive Ordered Devices | | |
| | | | | Days in Use | |
| Year | Number | Days in Use | Number | Minimum (Rounded) | Maximum (Rounded) |
|---|---|---|---|---|---|
| 1969 | 30 | 462 | 94 | 8,100 | 20,800 |
| 1970 | 180 | 2,363 | 113 | 8,100 | 22,600 |

| | Ratio of Days Used Executive Ordered: Court Ordered | | Average Days in Use Per Device | | |
| | | | Court Ordered Devices | Executive Ordered Devices | |
| Year | Minimum | Maximum | | Minimum | Maximum |
|---|---|---|---|---|---|
| 1969 | 17.5* | 45.0* | 15.4 | 86.2 | 221.3 |
| 1970 | 3.4 | 9.6 | 13.1 | 71.7 | 200.0 |

*Ratios for 1969 are less meaningful than those for 1970, since court-ordered surveillance program was in its initial stage in 1969.

Source:

(1) Letter from Assistant Attorney General Robert Mardian to Senator Edward M. Kennedy, March 1, 1971. Source figures withheld at request of Justice Department.

(2) Reports of Administrative Office of U. S. Courts for 1969 and 1970.

MR. JUSTICE WHITE, concurring in the judgment.

This case arises out of a two-count indictment charging conspiracy to injure and injury to Government property. Count I charged Robert Plamondon and two codefendants with conspiring with a fourth person to injure Government property with dynamite. Count II charged Plamondon alone with dynamiting and injuring Government property in Ann Arbor, Michigan. The defendants moved to compel the United States to disclose, among other things, any logs and records of electronic surveillance directed at them, at unindicted coconspirators, or at any premises of the defendants or coconspirators. They also moved for a hearing to determine whether any electronic surveillance disclosed had tainted the evidence on which the grand jury indictment was based and which the Government intended to use at trial. They asked for dismissal of the indictment if such taint were determined to exist. Opposing the motion, the United States submitted an affidavit of the Attorney General of the United States disclosing that "[t]he defendant Plamondon has participated in conversations which were overheard by Government agents who were monitoring wiretaps which were being employed to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government," the wiretaps having been expressly approved by the Attorney General. The records of the intercepted conversations and copies of the memorandum reflecting the Attorney General's approval were submitted under seal and solely for the Court's *in camera* inspection.[1]

---

[1] The Attorney General's affidavit concluded:

"I certify that it would prejudice the national interest to disclose the particular facts concerning these surveillances other than to the court *in camera*. Accordingly, the sealed exhibit referred to herein is being submitted solely for the court's *in camera* inspection and a

As characterized by the District Court, the position of the United States was that the electronic monitoring of Plamondon's conversations without judicial warrant was a lawful exercise of the power of the President to safeguard the national security. The District Court granted the motion of defendants, holding that the President had no constitutional power to employ electronic surveillance without warrant to gather information about domestic organizations. Absent probable cause and judicial authorization, the challenged wiretap infringed Plamondon's Fourth Amendment rights. The court ordered the Government to disclose to defendants the records of the monitored conversations and directed that a hearing be held to determine the existence of taint either in the indictment or in the evidence to be introduced at trial.

The Government's petition for mandamus to require the District Court to vacate its order was denied by the Court of Appeals. 444 F. 2d 651 (CA6 1971). That court held that the Fourth Amendment barred warrantless electronic surveillance of domestic organizations even if at the direction of the President. It agreed with the District Court that because the wiretaps involved were therefore constitutionally infirm, the United States must turn over to defendants the records of overheard conversations for the purpose of determining whether the Government's evidence was tainted.

I would affirm the Court of Appeals but on the statutory ground urged by defendant-respondents (Brief 115) without reaching or intimating any views with respect

---

copy of the sealed exhibit is not being furnished to the defendants. I would request the court, at the conclusion of its hearing on this matter, to place the sealed exhibit in a sealed envelope and return it to the Department of Justice where it will be retained under seal so that it may be submitted to any appellate court that may review this matter." App. 20–21.

to the constitutional issue decided by both the District Court and the Court of Appeals.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520, forbids, under pain of criminal penalties and civil actions for damages, any wiretapping or eavesdropping not undertaken in accordance with specified procedures for obtaining judicial warrants authorizing the surveillance. Section 2511 (1) establishes a general prohibition against electronic eavesdropping "[e]xcept as otherwise specifically provided" in the statute. Later sections provide detailed procedures for judicial authorization of official interceptions of oral communications; when these procedures are followed the interception is not subject to the prohibitions of § 2511 (1). Section 2511 (2), however, specifies other situations in which the general prohibitions of § 2511 (1) do not apply. In addition, § 2511 (3) provides that:

> "Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U. S. C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The con-

tents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power."

It is this subsection that lies at the heart of this case.

The interception here was without judicial warrant, it was not covered by the provisions of § 2511 (2) and it is too clear for argument that it is illegal under § 2511 (1) unless it is saved by § 2511 (3). The majority asserts that § 2511 (3) is a "disclaimer" but not an "exception." But however it is labeled, it is apparent from the face of the section and its legislative history that if this interception is one of those described in § 2511 (3), it is not reached by the statutory ban on unwarranted electronic eavesdropping.[2]

The defendants in the District Court moved for the production of the logs of any electronic surveillance to which they might have been subjected. The Govern-

---

[2] I cannot agree with the majority's analysis of the import of § 2511 (3). Surely, Congress meant at least that if a court determined that in the specified circumstances the President could constitutionally intercept communications without a warrant, the general ban of § 2511 (1) would not apply. But the limitation on the applicability of § 2511 (1) was not open-ended: it was confined to those situations that § 2511 (3) specifically described. Thus, even assuming the constitutionality of a warrantless surveillance authorized by the President to uncover private or official graft forbidden by federal statute, the interception would be illegal under § 2511 (1) because it is not the type of presidential action saved by the Act by the provision of § 2511 (3). As stated in the text and n. 3, infra, the United States does not claim that Congress is powerless to require warrants for surveillances that the President otherwise would not be barred by the Fourth Amendment from undertaking without a warrant.

ment responded that conversations of Plamondon had been intercepted but took the position that turnover of surveillance records was not necessary because the interception complied with the law. Clearly, for the Government to prevail it was necessary to demonstrate, first, that the interception involved was not subject to the statutory requirement of judicial approval for wiretapping because the surveillance was within the scope of § 2511 (3); and, secondly, if the Act did not forbid the warrantless wiretap, that the surveillance was consistent with the Fourth Amendment.

The United States has made no claim in this case that the statute may not constitutionally be applied to the surveillance at issue here.[3] Nor has it denied that to

[3] See Tr. of Oral Arg. 13–14:

"Q. . . . I take it from your answer that Congress could forbid the President from doing what you suggest he has the power to do in this case?

"Mr. Mardian [Assistant Attorney General]: That issue is not before this Court——

"Q. Well, I would—my next question will suggest that it is. Would you say, though, that Congress could forbid the President?

"Mr. Mardian: I think under the rule announced by this court in *Colony Catering* that within certain limits the Congress could severely restrict the power of the President in this area. . .

"Q. Well, let's assume Congress says, then, that the Attorney General, or the President may authorize the Attorney General in specific situations to carry out electronic surveillance if the Attorney General certifies that there is a clear and present danger to the security of the United States?

"Mr. Mardian: I think that Congress has already provided that, and——

"Q. Well, would you say that Congress would have the power to limit surveillances to situations where those conditions were satisfied?

"Mr. Mardian: Yes, I would—I would concur in that, Your Honor."

A colloquy appearing in the debates on the bill, appearing at 114 Cong. Rec. 14750–14751, indicates that some Senators considered § 2511 (3) as merely stating an intention not to interfere with the constitutional powers that the President might otherwise have to

comply with the Act the surveillance must either be sup-
ported by a warrant or fall within the bounds of the ex-
ceptions provided by § 2511 (3). Nevertheless, as I read
the opinions of the District Court and the Court of Ap-
peals, neither court stopped to inquire whether the chal-
lenged interception was illegal under the statute but
proceeded directly to the constitutional issue without
adverting to the time-honored rule that courts should
abjure constitutional issues except where necessary to de-
cision of the case before them. *Ashwander* v. *Tennessee
Valley Authority*, 297 U. S. 288, 346–348 (1936) (con-
curring opinion). Because I conclude that on the record
before us the surveillance undertaken by the Government
in this case was illegal under the statute itself, I find it
unnecessary, and therefore improper, to consider or
decide the constitutional questions which the courts below
improvidently reached.

The threshold statutory question is simply put: Was
the electronic surveillance undertaken by the Govern-
ment in this case a measure deemed necessary by the
President to implement either the first or second branch
of the exception carved out by § 2511 (3) to the general
requirement of a warrant?

The answer, it seems to me, must turn on the affidavit
of the Attorney General offered by the United States in
opposition to defendants' motion to disclose surveillance
records. It is apparent that there is nothing whatsoever
in this affidavit suggesting that the surveillance was

---

engage in warrantless electronic surveillance. But the Department
of Justice, it was said, participated in the drafting of § 2511 (3)
and there is no indication in the legislative history that there was
any claim or thought that the supposed powers of the President
reached beyond those described in the section. In any case, it seems
clear that the congressional policy of noninterference was limited
to the terms of § 2511 (3).

undertaken within the first branch of the § 2511 (3) exception, that is, to protect against foreign attack, to gather foreign intelligence or to protect national security information. The sole assertion was that the monitoring at issue was employed to gather intelligence information "deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." App. 20.

Neither can I conclude from this characterization that the wiretap employed here fell within the exception recognized by the second sentence of § 2511 (3); for it utterly fails to assume responsibility for the judgment that Congress demanded: that the surveillance was necessary to prevent overthrow by force or other unlawful means or that there was any other clear and present danger to the structure or existence of the Government. The affidavit speaks only of attempts to attack or subvert; it makes no reference to force or unlawfulness; it articulates no conclusion that the attempts involved any clear and present danger to the existence or structure of the Government.

The shortcomings of the affidavit when measured against § 2511 (3) are patent. Indeed, the United States in oral argument conceded no less. The specific inquiry put to Government counsel was: "Do you think the affidavit, standing alone, satisfies the Safe Streets Act?" The Assistant Attorney General answered "No, sir. We do not rely upon the affidavit itself . . . ." Tr. of Oral Arg. 15.[4]

Government counsel, however, seek to save their case by reference to the *in camera* exhibit submitted to the

---

[4] See also Tr. of Oral Arg. 17:

"Q. . . . If all the *in camera* document contained was what this affidavit contained, it would not comply with the Safe Streets Act?

"Mr. Mardian: I would concur in that, Your Honor."

District Court to supplement the Attorney General's affidavit.[5] It is said that the exhibit includes the re- quest for wiretap approval submitted to the Attorney General, that the request asserted the need to avert a clear and present danger to the structure and existence of the Government, and that the Attorney General endorsed his approval on the request.[6] But I am uncon- vinced that the mere endorsement of the Attorney Gen- eral on the request for approval submitted to him must be taken as the Attorney General's own opinion that the wiretap was necessary to avert a clear and present danger to the existence or structure of the Government

---

[5] The Government appears to have shifted ground in this respect. In its initial brief to this Court, the Government quoted the Attorney. General's affidavit and then said, without qualification, "These were the grounds upon which the Attorney General authorized the sur- veillance in the present case.". Brief for United States 21. Moreover, counsel for the Government stated at oral argument "that the *in camera* submission was not intended as a justification for the authorization, but simply [as] a proof of the fact that the authoriza- . tion had been granted by the Attorney General of the United States, over his own signature." Tr. of Oral Arg. 6–7.

Later at oral argument, however, the Government said: "[T]he affidavit was never intended as the basis for justifying the sur- veillance in question. . . . . The justification, and again I suggest that it is only a partial justification, is contained in the *in camera* exhibit which was submitted to Judge Keith. . . . We do not rely upon the affidavit itself but the *in camera* exhibit." Tr. of Oral Arg. 14–15. And in its reply brief, the Government says flatly: "Those [*in camera*] documents, and not the affidavit, are the proper basis for determining the ground upon which the Attorney General acted.". Reply Brief for United States 9.

[6] Procedures in practice at the time of the request here in issue apparently resulted in the Attorney General's merely countersigning a request which asserted a need for a wiretap. We are told that under present procedures the Attorney General makes an express written finding of clear and present danger to the structure and ex- istence of the Government before he authorizes a tap. Tr. of Oral Arg. 17–18.

when, in an affidavit later filed in court specifically characterizing the purposes of the interception and at least impliedly the grounds for his prior approval, the Attorney General said only that the tap was undertaken to secure intelligence thought necessary to protect against attempts to attack and subvert the structure of Government. If the Attorney General's approval of the interception is to be given a judicially cognizable meaning different from the meaning he seems to have ascribed to it in his affidavit filed in court, there obviously must be further proceedings in the District Court.

Moreover, I am reluctant to proceed in the first instance to examine the *in camera* material and either sustain or reject the surveillance as a necessary measure to avert the dangers referred to in §2511 (3). What Congress excepted from the warrant requirement was a surveillance which *the President* would assume responsibility for deeming an essential measure to protect against clear and present danger. No judge can satisfy this congressional requirement.

Without the necessary threshold determination, the interception is, in my opinion, contrary to the terms of the statute and subject therefore to the prohibition contained in §2515 against the use of the fruits of the warrantless electronic surveillance as evidence at any trial.[7]

There remain two additional interrelated reasons for not reaching the constitutional issue. First, even if it were determined that the Attorney General purported to

---

[7] "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." 18 U. S. C. §2515.

344

authorize an electronic surveillance for purposes exempt
.from the general provisions of the Act, there would re-
main the issue whether his discretion was properly au-
thorized. The United States concedes that the act of
the Attorney General authorizing a warrantless wiretap
is subject to judicial review to some extent, Brief for
United States 21–23, and it seems improvident to proceed
to constitutional questions until it is determined that the
Act itself does not bar the interception here in question.

Second, and again on the assumption that the surveil-
lance here involved fell within the exception provided
by § 2511 (3), no constitutional issue need be reached
in this case if the fruits of the wiretap were inadmissible
on statutory grounds in the criminal proceedings pending
against respondent Plamondon. Section 2511 (3) itself
states that "[t]he contents of any wire or oral communi-
cation intercepted by authority of the President in the
exercise of the foregoing powers may be received in evi-
dence in any trial hearing, or other proceeding *only*
where such interception was reasonable, and shall not be
otherwise used or disclosed except as is necessary to
implement that power." (Emphasis added.) There has
been no determination by the District Court that it
would be reasonable to use the fruits of the wiretap
against Plamondon or that it would be necessary to do
so to implement the purposes for which the tap was
authorized.

My own conclusion, again, is that, as long as non-
constitutional, statutory grounds for excluding the evi-
dence or its fruits have not been disposed of, it is
improvident to reach the constitutional issue.

I would thus affirm the judgment of the Court of
Appeals unless the Court is prepared to reconsider the
necessity for an adversary, rather than an *in camera,*
hearing with respect to taint. If *in camera* proceedings
are sufficient and no taint is discerned by the judge,
this case is over, whatever the legality of the tap.