No. 72–307. RUSSO ET AL. *v.* BYRNE, U. S. District
Judge. C. A. 9th Cir. Certiorari denied. MR. JUSTICE
BRENNAN would grant certiorari.

MR. JUSTICE DOUGLAS, dissenting.

I regret that the Court does not take this occasion to
lay down some further ground rules for the conduct of
criminal cases involving electronic surveillance in the
sensitive area which involves both the Fourth and the
Sixth Amendments.

In *Alderman* v. *United States,* 394 U. S. 165, we laid
down rules governing the district courts where there
had been electronic surveillance of the defendant in a
criminal case or where in other surveillance his words had
been recorded. *Alderman* and its descendants made pos-
sible the conduct of criminal trials with fairness to all
sides and with no disturbance to orderly proceedings.

The present case is one of several that have come across
my desk this year involving not the surveillance of a

defendant in a criminal case but the surveillance of his lawyer.

It is time, I think, that we hold that the confidences of the lawyer-client relationship remain inviolate. It is also time that we set forth the prescribed procedures in an *Alderman* type of opinion.

The problems where the lawyer is involved seem to me to be as critical as those where the defendant's privacy under the Fourth Amendment is violated.[1] The ruling

---

[1] Wiretapping, which Justice Holmes called "dirty business," *Olmstead* v. *United States*, 277 U. S. 438, 470 (dissenting), was put by Justice Brandeis in a constitutional frame of reference:

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Id.*, at 478.

And he added:

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." *Id.*, at 485.

which I made this last summer when I granted the stay in this case was based on the premise that the teaching of *Alderman* would fully apply to a case where the Sixth Amendment rights of a defendant were imperiled.

We held in *United States* v. *United States District Court,* 407 U. S. 297, that electronic surveillance of internal security measures was not permissible on the basis of an order of the Attorney General, but only on judicial search warrants. We reserved decision "with respect to activities of foreign powers or their agents." *Id.,* at 322. When the argument was held last summer on the stay order, the prosecution in oral presentation distinguished that case on the ground that it involved "domestic" surveillance while the present one involved "foreign" surveillance. The prosecution seemed reluctant to enlarge on that distinction, which led me to note in the opinion I filed granting the stay that we may be dealing only with a matter of semantics. The prosecution never submitted to me *in camera* the logs in question. I have now seen them, and it appears that the electronic surveillance was of a telephone of a foreign national and that the intercepted conversations in this case had nothing to do "with respect to activities of foreign powers or their agents," the question we reserved in the previous case. *Ibid.* As I understand it, the conversation was an inquiry by one of the counsel concerning wholly personal social and commercial matters. It is not conceivable to me that this conversation is in the "foreign" field in the sense the word is used in the statutes involved in the *United States District Court* case. No activity of any foreign "agent" is even suggested. We should therefore take the case to resolve what immunity the Executive Branch has in setting up schemes of pervasive surveillance of foreign nationals that is unrelated to espionage.

It is, however, said that the conversation is utterly irrelevant to the issues in the present case. How can we know? Only one immersed in building a case for the prosecution or constructing a defense can know whether an innocuous-appearing conversation would be a "link" in a chain of evidence which in time would be necessary or convenient for either the prosecution or the defense. That is why I feel strongly that, as we held in *Alderman* v. *United States, supra,* the question of relevance must be submitted for adversary hearing before the trial judge.[2]

I suspect that if that had been done here, the dispute that has delayed this trial for some months would have been quickly resolved. A grave injustice may or may not ride on the denial of certiorari today. My concern is

---

[2] In *Alderman* v. *United States* we read:

"Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of factual materials, and after consideration of the many and subtle interrelationships which may exist among the facts reflected by these records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable.

"Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands. It may be that the prospect of disclosure will compel the Government to dismiss some prosecutions in deference to national security or third-party interests. But this is a choice the Government concededly faces with respect to material which it has obtained illegally and which it admits, or which a judge would find, is arguably relevant to the evidence offered against the defendant." 394 U. S., at 183–184.

not that, but the administration of the law. I use the word law in its largest sense—where the prosecution as well as the defense is required to live within the spirit and letter of the constitutional rules designed to keep Government off the backs of the people and to take no shortcuts because of public hysteria or political pressures.

That question concerning the applicability of the pretrial procedures laid out in *Alderman* to the protection of Sixth Amendment claims makes this case a singularly appropriate occasion for laying down the ground rules that will apply in federal trials.