STATE of Wisconsin, Plaintiff-Appellant,

v.

Leonard MURDOCK, Defendant-Respondent.†

Court of Appeals

*No. 88–0918–CR. Submitted on briefs October 18, 1988.—*
*Decided May 11, 1989.*

(Also reported in 445 N.W.2d 319.)

†Petition to review granted.

For the plaintiff-appellant the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Barry M. Levenson,* assistant attorney general.

For the defendant-respondent the cause was submitted on the brief of *David M. Sweet,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J. This case presents a significant search and seizure issue: what is the scope of a permissible warrantless search of premises when the search is incident to a lawful arrest? Since the issue involves the application of constitutional principles to undisputed facts, we decide this matter de novo. *See State v. Fry,* 131 Wis. 2d 153, 171, 175, 388 N.W.2d 565, 573, *cert. denied,* 479 U.S. 989 (1986).[1]

---

[1]Contrary to the dissent's assertions, Dissent at pages 211, 214-215 and 217, we do not ignore but, rather, adopt the trial court's findings of historical facts, about which there is no dispute.

## I.

Four law enforcement officers went to a rooming house where Leonard Murdock lived to arrest him on three warrants. They found Murdock in a room with two other men. The room was small, approximately ten by twelve feet or twelve by fourteen feet. Connected to the room was a pantry-type closet, which was approximately six by four feet. There was either no door to the pantry-closet or it was open.

Murdock and the other men were ordered to the floor, and were handcuffed with their hands behind their backs. After the men were handcuffed, one of the officers saw a .22 caliber round on a shelf in the pantry. There were drawers underneath the shelf, and the officer opened them looking for a weapon. The officer testified at the suppression hearing that before they went into the rooming house to arrest Murdock, one of the other officers had explained that Murdock was suspected of having "waived a gun at a witness or someone and he was supposedly armed."

A short-barreled rifle was found in one of the drawers. At the time the rifle was found, Murdock was laying on the ground in front of the pantry, approximately three to four feet from the drawer and, according to the trial court, the officers had the situation under "complete control," there being "no resistance."

Murdock was charged with the felony of possessing a short-barreled rifle in violation of sec. 941.28, Stats. Although not challenging the lawfulness of his arrest, Murdock filed a motion to suppress the rifle. The trial court granted the motion and dismissed the case. We reverse.

## II.

■

This case is governed by the search and seizure provisions in the United States Constitution, the Wisconsin Constitution, and the Wisconsin statutes. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 11 of the Wisconsin Constitution is substantially the same:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Section 968.11, Stats., provides:

> When a lawful arrest is made, a law enforcement officer may reasonably search the person arrested and an area within such person's immediate presence for the purpose of:
>
> (1) Protecting the officer from attack;
>
> (2) Preventing the person from escaping;
>
> (3) Discovering and seizing the fruits of the crime; or

(4) Discovering and seizing any instruments, articles or things which may have been used in the commission of, or which may constitute evidence of, the offense.

In the context of an analysis of what is the permissible scope of a search incident to a lawful arrest, these constitutional and statutory provisions are consistent with one another and are coextensive. *See Fry,* 131 Wis. 2d at 165-168, 171-176, 388 N.W.2d at 570-572, 573-575. Accordingly, to paraphrase Gertrude Stein's famous aphorism about roses, what is lawful under the Fourth Amendment to the United States Constitution, is lawful under Article I, section 11 of the Wisconsin Constitution, is lawful under sec. 968.11, Stats. *See ibid.*

A warrantless search incident to a lawful arrest is permissible for two reasons: (1) to prevent the person being arrested from having access to weapons that might endanger the arresting officer or permit the suspect's escape, and (2) to prevent the person being arrested from concealing or destroying evidence. *Chimel v. California,* 395 U.S. 752, 762-763 (1969). Thus, *Chimel* recognized that there is "ample justification" for officers who are lawfully arresting a suspect to search "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763.

*Chimel* concerned the full-scale search of a burglary suspect's home. The arresting officers "looked through the entire three-bedroom house, including the attic, the garage, and a small workshop." *Id.* at 754. In striking down the search as an unreasonable invasion of Chimel's Fourth Amendment rights, the Supreme Court overturned a line of cases that lower courts had interpreted as authorizing almost any search that was incident to a lawful arrest. *Id.* at 755-768. *Chimel* adopted a case-by-

case approach to determine whether a particular search was reasonable under the Fourth Amendment. *Id.* at 765. Twelve years later, in *New York v. Belton,* 453 U.S. 454 (1981), the Supreme Court—in the context of an automobile search—rejected this case-by-case approach in favor of a clear-cut, bright-line rule. Significantly, both *Chimel* and *Belton* were written by the same person, Justice Potter Stewart.

In *Belton,* a police officer stopped an automobile he saw speeding. After he stopped the car, the officer reasonably suspected the driver and passengers of illegally possessing marijuana. He ordered them out of the car, placed them under arrest, patted them down, and " 'split them up into four separate areas of the Thruway,' " while he searched the car. *Belton,* 453 U.S. at 455–457. The officer found Belton's leather jacket lying on the back seat. Unzipping one of the jacket's pockets, the officer discovered cocaine. *Id.* at 456.

New York's highest court threw out the search on the ground that a " 'warrantless search of zippered pockets of an unaccessible jacket may not be upheld as a search incident to a lawful arrest where there is no longer any danger that the arrestee or a confederate might gain access to the article.' " *Ibid.* The United States Supreme Court reversed, holding that since the jacket "was 'within the arrestee's immediate control' within the meaning of" *Chimel,* the search was "incident to a lawful custodial arrest, and it did not violate the Fourth and Fourteenth Amendments." *Id.* at 462–463.

*Belton* went beyond determining whether the officer's search of the jacket was reasonable under the specific circumstances of that case. It crafted a bright-line rule as to what constitutes an "area from within which [the person being arrested] might gain possession of a weapon or destructible evidence" to pass muster

under *Chimel,* 395 U.S. at 763, *irrespective of whether the area searched was actually accessible*:

> [W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.
>
> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.

*Belton,* 453 U.S. at 460 (footnotes omitted). Significantly, as two of the dissenting justices pointed out, Belton and his friends were arrested "*after* they had been removed from the car, patted down, and separated" so that at the time of the arrest and subsequent search "none of them could have reached the jackets that had been left on the back seat of the car." *Id.* at 466 (Brennan, J., dissenting) (emphasis in original). They thus characterized the Court's decision as "for the first time grant[ing] police officers authority to conduct a warrantless 'area' search under circumstances where there is no chance that the arrestee 'might gain possession of a weapon or destructible evidence.' " *Id.* at 468 (quoting *Chimel,* 395 U.S. at 763). In essence, however, *Belton* merely applied what *Chimel* had already recognized, namely that a search incident to a lawful arrest "must constitutionally be confined to the area within the arrestee's reach *at the time of his arrest." Vale v. Louisiana,* 399 U.S. 30, 33 (1970) (emphasis supplied).[2] Whether the area was within the arrestee's reach at the

---

[2] *Vale,* like *Chimel* and *Belton,* was also written by Justice Stewart.

time of the search, as opposed to the time of the arrest, is not material. *Belton; Fry.*

Fry was arrested for the crime of trespass. *Fry,* 131 Wis. 2d at 157–58, 388 N.W.2d at 567. The arresting officers had been told by another law enforcement agency that Fry was known to carry a gun in the glove compartment of his car and that any officer seeing him "should use caution." *Id.* at 157, 388 N.W.2d at 567. After his arrest, Fry and a passenger from Fry's automobile were handcuffed and placed in separate squad cars. *Id.* at 186, 388 N.W.2d at 579 (Bablitch, J., dissenting). The officers then searched Fry's car while Fry and his passenger were being guarded by other officers. A weapon was found in the locked glove compartment. *Ibid.*

*Fry* upheld the search and relied on *Belton*'s bright-line rule for its analysis under the United States Constitution, the Wisconsin Constitution, and sec. 968.11, Stats. *Fry,* 131 Wis. 2d at 165–68, 171–176, 388 N.W.2d at 570–572, 573–575. As *Fry* explained:

> The *Belton* rule is a simple and reasonable rule governing the search of an automobile after an arrest is made. A police officer may assume under *Belton* that the interior of an automobile is within the reach of a defendant when the defendant is still at the scene of an arrest, but the defendant is not physically in the vehicle. We cannot say as a matter of fact in all cases that a defendant never could regain access to the interior of an automobile after initially leaving the vehicle. Thus, we would seriously undermine police security if we adopted as a matter of constitutional fact the rule that the interior of an automobile never is within the reach of a suspect who is outside the vehicle at the arrest scene; such a rule would prohibit all automobile searches as an incident to arrest, unless the defendant was allowed to remain in the

automobile during the search, which increases the risk of danger to the officer. We cannot subscribe to such a limitation on the search incident to arrest rule.

*Id.* at 174–175, 388 N.W.2d at 574. The dissenting justices in *Fry* echoed, in part, the concerns expressed by the dissenting justices in *Belton. See id.* at 185, 187–188, 388 N.W.2d at 579, 580 (Bablitch, J., dissenting).

*Belton* saw the need for a bright-line rule to guide police officers who are forced to make split-second assessments at the risk of their lives. *See Belton,* 453 U.S. at 458. In this regard, it followed an earlier case, *United States v. Robinson,* 414 U.S. 218 (1973), where a similar need prompted the Court to approve the full search of the arrestee's person. As *Robinson* explained:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.

*Robinson,* 414 U.S. at 235. *Belton* expanded on *Robinson*'s theme:

> When a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional

protection, nor can a policeman know the scope of
his authority.

*Belton,* 453 U.S. at 459–460. We agree with the State
that there is the same need for a bright-line rule in
premises searches. Simply put, the validity of a search
incident to a lawful arrest must not depend on a lei-
surely, retrospective, analysis of countless factors, the
assessment of which must be made in an instant by
officers on the line. We therefore follow the clear path
cut by *Chimel, Robinson, Belton* and *Fry* and hold that a
warrantless premises search incident to a lawful arrest is
valid as long as it is limited to the area generally within
the "arrestee's reach at the time of his arrest,"[3] that is,
the room in which the arrest is made, including a contig-
uous open area such as a closet or pantry, and the arrest-
ing officers have reasonable grounds to conclude that
weapons or destructible evidence might be present in
that room.[4] Since the search here satisfies both prongs of
this test, it must be upheld.

The rule we adopt fully conforms with the teachings
of *Belton* and *Fry.*[5] *See United States v. Silva,* 745 F.2d

[3] *Vale,* 399 U.S. at 33, interpreting *Chimel,* 395 U.S. at 763.

[4] We mention "destructible evidence" in conformity with
*Chimel,* 395 U.S. at 763; *Belton,* 453 U.S. at 460, and *Fry,* 131
Wis. 2d at 184, 388 N.W.2d at 578 as well as sec. 968.11(3), (4),
Stats. It is not meant to assert, as contended by the dissent,
Dissent at 216, that this case involved evidence that could be
destroyed. It obviously did not. Neither did *Fry.*

[5] The dissent here misreads both *Belton* and *Fry* when it
states that those cases "involved automobile searches which were
incident to arrest and *where the areas searched were within the
control of the arrestee.*" Dissent at 214 (emphasis supplied). As
noted in this opinion, the arrestees in *Belton* were separated from
the automobile at the time of the search and, indeed, a dissent in
*Belton* pointed out that none of the men arrested "could have

207

840, 847 (4th Cir. 1984), *cert. denied,* 470 U.S. 1031 (1985) (lawful arrest in motel room justified warrantless search of nearby locked zippered bag even though arrestees were handcuffed behind their backs at the time); *United States v. Palumbo,* 735 F.2d 1095, 1097 (8th Cir.), *cert. denied,* 469 U.S. 934 (1984) (lawful arrest in hotel room justified warrantless search behind dresser drawer even though area might have been inaccessible to arrestee at the time of the search).[6] *Compare Stackhouse v. State,* 468 A.2d 333, 337–338 (Md. 1983), which declined to extend *Belton* to dwellings, *with Foster v. State,* 464 A.2d 986, 1000–1001 (Md. 1983), *cert. denied,* 464 U.S. 1073 (1984), which upheld the warrantless search of a partially open nightstand drawer even though the suspect was handcuffed behind her back at the time of the arrest. Significantly, the majority in *Stackhouse* relied on one of the two dissenting opinions in *Belton. See Stackhouse,* 468 A.2d at 338. Recognizing that the room in which a person is arrested generally encompasses the extent of the area within that person's reach, we—as did *Belton* and *Fry*—avoid the uncertainty of a case-by-case judicial sifting and weighing of

reached the jackets." *Belton,* 453 U.S. at 466. By the same token, Fry and his passenger were not only out of Fry's automobile when it was searched but were, indeed, sitting handcuffed in separate squad cars guarded by other officers. *Fry,* 131 Wis. 2d at 186, 388 N.W.2d at 579 (Bablitch, J., dissenting). The situations in both *Belton* and *Fry* were thus "stabilized," *see* Dissent at 212–213, 215, at the time of the respective searches.

[6]One commentator, not sympathetic to the *Belton* "bright-line" rule, recognizes that its application to premises "would most likely be in the form of one of the intermediate positions found wanting in *Chimel*—a one-room rule or, more likely, a rule based on the extent of the person's control just *before* his arrest." 2 W.R. La Fave, *Search and Seizure,* sec. 6.3 at 635 (2d ed. 1987) (emphasis in original).

myriad matters (size of room, place in room where person arrested, proximity of search to place of arrest, the degree of stabilization, etc.). As already noted, law enforcement officers must instantaneously process these matters at a time of stress, and often at great personal risk.

The United States Supreme Court has reminded us that "[e]very arrest must be presumed to present a risk of danger to the arresting officer." *Washington v. Chrisman,* 455 U.S. 1, 7 (1982).[7] It is appropriate to balance this danger, and the danger that evidence will be destroyed, against the privacy rights we all enjoy. *See New Jersey v. Bruzzese,* 463 A.2d 320, 332–333 (N.J. 1983), *cert. denied,* 465 U.S. 1030 (1984). " '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York,* 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court,* 407 U.S. 297, 313 [1972]). As *Belton* notes, "the lawful custodial arrest jus-

[7]"During 1987, 27 officers were slain during arrest situations, accounting for more line-of-duty deaths than any other circumstance," *Uniform Crime Reports—Law Enforcement Officers Killed and Assaulted* p. 3 (U.S. Dept. of Justice 1987). Eighteen police officers were killed in arrest situations during the first six months of 1988. Release, U.S. Dept. of Justice. Contrary to the dissent's assertion, Dissent at 215–216, we may acknowledge the tragedies, both past and potential, inherent in these figures though they are not part of the appellate record in this case. As explained by the Federal Advisory Committee's note to Rule 201 of the Federal Rules of Evidence, this type of information may be used by trial and appellate courts as an aid in the ascertainment of legal principles, 59 Wis. 2d at R26–R27, because that task "should be guided by experience and understanding." Davis, *Judicial Notice,* 55 Col. L. Rev. 945, 949 (1955) quoted in the Judicial Council Committee's note to Rule 902.01, Stats., 59 Wis. 2d at R25.

tifies the infringement of any [Fourth Amendment] privacy interest" caused by the search. *See Belton,* 453 U.S. at 461. By limiting the search to the zone of potential danger, recognized by both *Belton,* 453 U.S. at 460, and *Fry,* 131 Wis. 2d at 174, 388 N.W.2d at 574, we heed the Supreme Court's forceful reminder that the Fourth Amendment was adopted by Framers well aware of the outrages perpetrated by the king's myrmidons under the aegis of the hated general warrants and writs of assistance. *Payton,* 445 U.S. at 583-584 n. 21. *See Chimel,* 395 U.S. at 760-761. We also heed the need for effective and safe law enforcement.[8]

---

[8]Contrary to the dissent's assertion, *Belton* does not stand for the proposition that the *Chimel* case-by-case approach "is still the law in this country concerning the validity of a search of a home incident to a lawful arrest." Dissent at 217. Indeed, as *Belton* states, "while the Court in *Chimel* held that the police could not search all the drawers in an arrestee's house simply because the police had arrested him at home, the Court noted that drawers within an arrestee's reach could be searched because of the danger their contents might pose to the police." *Belton,* 453 at 461 (citing *Chimel,* 395 U.S. at 763). *Belton* abandoned *Chimel's* case-by-case evaluation of whether, in fact, the searched areas were in "an arrestee's reach" in favor of a bright-line rule that does not turn on whether the area was actually accessible or not. It neither extended, nor declined to extend, the bright-line rule it announced to searches of premises. The issue was simply not before the Court. Rather than "revers[ing] *Chimel,*" *see* Dissent at 217, this court follows *Belton* and *Fry,* so that police officers who must make split-second decisions need not try to guess whether some court might later consider the situation "stabilized." *See* Dissent at pages 212-213, 215.

We also disagree with the implication in the dissenting opinion that this decision is a license for unbridled search; it is not. The bright-line rule here, as in *Belton/Fry,* is narrow and specific. *See* page 207, *supra.*

*By the Court.*—Order reversed.

MOSER, P.J. (*dissenting*). To begin with my reasons for dissent, I first note that the majority opinion overlooks the historical facts found by the trial court. Therefore, they have to be explicated here. On September 30, 1987, Milwaukee detective deputy sheriff Edmund Banaszak (Banaszak) was assigned three arrest warrants for Murdock. Two warrants were for possession of controlled substances, and one was for battery while armed with a knife. Banaszak and three other detectives assigned to arrest Murdock were also told that Murdock had previously pointed a weapon at a woman.

Banaszak and his three colleagues went to the Milwaukee rooming house where Murdock lived. After arriving at the rooming house, the officers were advised that Murdock had rented room "2," but was at that time moving into room "15," which was adjacent to room "2" and joined by a doorway.[1] At the suppression hearing, Banaszak stated that he knocked on the door to room "15," announced the presence of the police, heard movement within the room, and waited from ten to fifteen minutes for a response. When the door finally opened, he and his three colleagues walked in with their weapons drawn. The dimensions of the room were either ten feet by twelve feet or twelve feet by fourteen feet. Banaszak ordered the three people in the room to "hit the floor." They complied immediately, and while lying on their stomachs, their hands were handcuffed behind their

---

[1] *See State v. Warfield,* 184 Wis. 56, 60, 198 N.W. 854, 856 (1924). A person's rented room in a rooming house is his/her home for purposes of determining whether a reasonable or unreasonable search and seizure has taken place under the Wisconsin Constitution, art. I, sec. 11, and the fourth amendment of the United States Constitution.

backs. Banaszak handcuffed Murdock, and while still bending over Murdock, observed detective Eugene Welch (Welch) holding a .22 caliber bullet which Welch found on a shelf in a small pantry. The pantry area was adjacent to the room, and was located three to four feet from Murdock's head as he lay face down and handcuffed on the floor. At that time, Banaszak also saw Welch open the middle drawer of a set of drawers built into the pantry wall, and extract a sawed-off rifle.

On cross-examination at the suppression hearing, Banaszak testified that Murdock's room was stabilized before the rifle was found. His testimony was as follows:

Q Mr. Banaszak, you testified that you have been a member of the Sheriff's Department for approximately 21 years; is that correct?

A Twenty-two.

Q Twenty-two years. Have you received training in proper arrest procedures?

A Yes.

Q Would it be correct to say that the first matter to be taken care of in arresting someone is to ensure that that person being arrested is subdued and cannot flee?

A No.

Q What would be the first step in that procedure?

A Stabilizing the area.

Q What do you mean by stabilizing the area?

A Making sure everybody I observed there [sic] actions and that they're not in any position to injure anyone.

Q Did you take that step in this case?

A Yes.

Detective Welch testified similarly as follows:

Q So, every single person in that room had been more or less placed under control with handcuffs behind their backs and they were laying on the floor?

A Yes.

The detectives provided further uncontested testimony which established that throughout the arrest there was no struggle, no evasive action taken, no resistance and no escape attempts by anyone. In short, Murdock and his two guests immediately cooperated with every police request.

The trial court found that all of the above was historical fact, and particularly stressed that Murdock and his two guests were face down, with their hands handcuffed behind their backs, when Welch found the bullet, proceeded to rummage through the drawers in the pantry, and ultimately removed the sawed-off rifle. Furthermore, Banaszak was bent over Murdock's prone body, and Welch was positioned between Murdock and the weapon.

The trial court noted that while the officers had a right to be on the premises to make a lawful arrest and to seize the bullet, they did not have the right to make a further search on the pretense that because Murdock's head was approximately three to four feet from the pantry area, they feared for their safety. The trial court also noted that the officers had the situation under complete control, that the area was stabilized, and that there was no resistance. It therefore held that the search was unreasonable and unwarranted. In so doing, the court rejected the State's argument that it accept as a bright-line rule that a search of a home is an extension of the law, as authorized by the United States Supreme Court

in *New York v. Belton*,[2] and the Wisconsin Supreme Court in *State v. Fry*,[3] involving constitutionally valid automobile searches.

The majority opinion here rejected the trial court's determination that the search was illegal, and held that the search was valid because it was a logical extension of *Belton* and *Fry*. I disagree because the majority has disregarded the trial court's findings of historical facts, and has literally created its own. Also, *Belton* and *Fry* involved automobile searches which were incident to arrest and where the areas searched were within the control of the arrestee. Those cases did not involve searches of homes, and thus their extension to this case is limited.

In reviewing an order suppressing evidence, the trial court's findings of evidentiary or historical facts must be upheld unless they are against the great weight and clear preponderance of the evidence.[4] I believe the majority opinion ignores the uncontroverted historical facts obtained from the testimony of Banaszak and Welch. When they entered Murdock's home, all four detectives had their weapons drawn. Banaszak ordered Murdock and his two guests to the floor. They immediately complied. After the three men had their hands handcuffed behind them, and were lying facedown on the floor, and

[2]453 U.S. 454 (1981). The Supreme Court reversed the New York State Court of Appeals, and held that it was proper for police to search an automobile glove compartment while the defendant stood outside the automobile.

[3]131 Wis. 2d 153, 388 N.W.2d 565 (1986). Our supreme court extended *Belton* to allow a police search of an automobile glove compartment when the defendant was out of the automobile, handcuffed and sitting in a police automobile.

[4]*State v. Guzy*, 139 Wis. 2d 663, 671, 407 N.W.2d 548, 552 (1987).

while Banaszak was leaning over Murdock's prone body, Welch found a bullet on a shelf in the pantry. Welch was standing in the pantry, between Murdock and the drawers he was opening. The trial court found that the detectives had "stabilized the area" by making sure that Murdock and his guests were not in any position to injure any one, and that every person in the room was placed under control.

It is on these historical facts that the trial court concluded that the detectives were in control of the area, that Murdock could not secure the weapon, and that therefore the search was constitutionally unreasonable. Whether a search is reasonable is a question of constitutional fact.[5] Such findings of constitutional fact are reviewed by appellate courts independently.[6] On review of these constitutional fact findings, an appellate court cannot ignore the trial court's findings of historical facts. Rather, we must apply constitutional principles to the facts as found.[7] However, the majority here has ignored the trial court's findings of historical facts. In addition, the majority has adopted a bright-line rule relative to home searches, and determined that the search of Murdock's home was reasonable because every arrest must be presumed to present a risk of danger to the arresting officer(s). In support of this presumption, the majority cites to a federal uniform crime report which suggests that during 1987, twenty-seven police officers were killed in arrest situations. Those deaths are tragic, but they are not presented in the record of the case before this court, and cannot be used to support a rejection of the trial

[5] *See State v. Flakes,* 140 Wis. 2d 411, 426, 410 N.W.2d 614, 620 (Ct. App. 1987).

[6] *Fry,* 131 Wis. 2d at 171, 388 N.W.2d at 574.

[7] *State v. Owens,* 148 Wis. 2d 922, 931, 436 N.W.2d 869, 873 (1989).

court's historical and constitutional fact finding. Under the facts of this case, Murdock could not secure the weapon found by Welch, and thus there was an unwarranted, unreasonable search through the drawers in the pantry of his home.

I further reject the majority's finding as constitutional fact that the unwarranted search was reasonable because of the possibility that the evidence might be destroyed. There is absolutely no historical evidence in the record, argument to the trial court, ruling by the trial court or argument in the appellate briefs tendered to this court on the issue of destruction of evidence. Such a finding of constitutional fact by this court has no merit.

The United States Supreme Court has held that there are two justifications for an unwarranted search of a home incident to a lawful arrest: (1) if there is a need to remove any weapons that the arrestee might try to use to resist arrest, or (2) to prevent the destruction or concealment of evidence.[8] The Supreme Court distinguished the necessity and inherent reasonableness of searching an arrested person, or an area that the arrestee might reach in order to grab a weapon, by stating that there is

> no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.[9]

The Court also held that trial court decisions regarding claimed illegal searches incident to a lawful arrest must be approached on a case-by-case basis to determine if a

---

[8]*Chimel v. California,* 395 U.S. 752, 763 (1969).
[9]*Id.*

search is reasonable under the fourth amendment.[10] This test is still the law in this country concerning the validity of a search of a home incident to a lawful arrest.[11] This court has no authority to change existing law, and we are bound by the mandates of the Supreme Court. The fact of the matter is that the majority opinion is not a logical extension of the United States Supreme Court's decision in *Chimel*, as construed in *Belton* and *Fry*. Instead, the majority opinion arrogates to itself the power to reverse *Chimel*. No federal or state lower courts can reject a United States Supreme Court construction of the federal Constitution; it is the duty of inferior courts to administer the Constitution as construed by our highest court.[12]

Thus, after finding historical facts, trial courts must then determine whether arresting officers properly searched an arrest scene. If an item is found pursuant to such a search, a trial court must ascertain whether the search incident to the arrest was valid because the item found, such as the weapon here, was in an area accessible to the arrestee, and that the arrestee might grab it in an attempt to resist arrest. Under the historical facts of this case, no such determination can be made.

I thus conclude that the majority opinion finds constitutional facts that cannot be derived from the historical facts. I differ, and would hold that the trial court's determination that the search of the pantry drawers was unreasonable was correct, because under the fourth amendment, one's home is entitled to special dignity and sanctity, and fundamentally, searches such as this are

---

[10]*Id.* at 765.

[11]*See Belton*, 453 U.S. at 460.

[12]*See South Carolina v. Bailey*, 289 U.S. 412, 420 (1933).

per se unreasonable.[13] Furthermore, I would affirm the trial court's finding as historical fact that the weapon found was in an area which Murdock could not possibly access, thus the search was unreasonable. I would therefore affirm the trial court's decision.

---

[13]*See Laasch v. State,* 84 Wis. 2d 587, 594, 267 N.W.2d 278, 283 (1978).