Gina Marie ESTRADA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–02–00366–CR.

Court of Appeals of Texas,
El Paso.

Aug. 28, 2003.

Allen Moore, Law Offices of Allen Moore, Odessa, for appellant.

Tracey Bright, County Attorney, Odessa, for State.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

SUSAN LARSEN, Justice.

Gina Marie Estrada pleaded guilty to possession of two ounces or less of marijuana. The court sentenced her to three days in jail and ordered her to pay a $350 fine. On appeal, she argues that the trial court erred by denying her motion to suppress. We reverse and remand.

### Factual Background

On the night in question, Estrada was house-sitting at her grandmother's house. The house is in the midst of an eight-acre area that has a fence around it. The driveway has a ranch-type gate across it. The house also has an enclosed front porch with two doors leading into it from outside.

Raymond Baladez, an Ector County deputy, responded to a complaint of loud music and "vehicles running up and down the road at a high rate of speed" near the Estrada house. Baladez testified that as he pulled up to the house, he saw two people who appeared to be juveniles running away. He found alcoholic beverages near where the juveniles had been. The gate was open. He went up to the house, identified himself, and banged on the door and a window several times, but got no response. Although he could hear voices and "footsteps of people running" inside, he did not hear any music. He had his dispatcher call the house in an attempt to make contact, but the line was busy.

Baladez then pulled his car out of the driveway and parked it on the street. While he was waiting there, he was dispatched to a nearby area where an anonymous caller had reported a disturbance involving gunshots. When he responded to that call, he could not find any evidence of a disturbance, so he returned to the Estrada house. Baladez suspected that someone at the Estrada house made the anonymous call so he or she could leave while Baladez was gone.

When Baladez returned to the Estrada house, he saw two vehicles leaving the house. He pulled the vehicles over and smelled alcohol and marijuana on the drivers. Both of the drivers were under twenty-one. They told Baladez that they had been drinking at the Estrada house. He instructed the drivers to back their cars into the driveway. At that time, the gate was closed.

Estrada testified that she heard Baladez advise one of the drivers to "tell your friend to open the door, because if she doesn't y'all are going to jail." At that point, Estrada walked out of the house and met Baladez at the gate. According to Baladez, Estrada had the strong odor of alcohol on her breath and the odor of marijuana on her clothes. He testified that at that time it would have been a "fair assumption" that Estrada and the two drivers had been smoking marijuana in the house. Nevertheless, he did not seek a search warrant then because he was "not looking for marijuana at that time." Bala-

dez asked Estrada if there were any other people in the house. She said that there were, but she did not know how many. Baladez also asked Estrada why she did not come to the door when he knocked earlier. He testified that she stated she did not know he had been there. His report of the incident stated that when he asked Estrada why she did not answer the door "[s]he advised that they didn't want to go to jail."

According to Baladez, Estrada "opened the gate and turned around and walked back towards the residence and [he] followed her." Baladez and Estrada proceeded to walk through the open porch doors. Estrada opened the door to the house, and Baladez smelled the odor of marijuana coming out of the house. Baladez then called for back-up to assist him and to "stand by while [he] cleared the rest of the house."

The prosecutor and Baladez engaged in the following colloquy regarding what happened when Estrada opened the door to the house:

Prosecutor: Did you observe anything when she opened the door?

Baladez: Yes, I could look inside. There was off to the right, there was a kitchen table and there were several—I stepped up on the door jam [sic] and because she was—she was calling everybody out and there was people coming out. And for my safety I wanted to keep them in my sights. And I looked down and I could see in the ashtray what appeared to be roaches[,] which were used marijuana cigarettes.

Prosecutor: Okay. So after you smelled the smoke and you made the observation from the door jam [sic], then you entered the residence at that point?

Baladez: Yes.

When the trial court attempted to clarify Baladez's testimony, the following exchange occurred:

The Court: All right. I want to make sure I am clear on this. You're standing at the gate and did you say the defendant opened the gate?

Baladez: Yes.

The Court: And then you and she were walking down the sidewalk talking.

Baladez: Yes.

The Court: And she entered the residence?

Baladez: Correct.

The Court: Did you go in with her?

Baladez: No, I was standing at the door while she was calling everybody to her.

The Court: All right. And then tell me, at what point and why you decided to enter the residence?

Baladez: Because I could smell the alcohol [sic]. There were several individuals in the residence and I didn't know if they were going to have weapons or not so I stepped in where I could see them and that's when I saw the marijuana.

Baladez walked through the residence and observed marijuana in other places. No weapons were found in the house or on the six people inside the house.

Baladez testified that it would have taken at least three hours to get a search warrant, while it would have taken less than a minute to dispose of the marijuana in the house. He believed that if he had left, the people at the house would have disposed of the marijuana. The prosecutor asked Baladez, "So based on that exigent circumstance, you entered the home in order to confiscate that marijuana before it could be destroyed, correct?" Baladez responded, "Correct."

At the conclusion of the suppression hearing, the trial court stated:

> Well, the officer had evidence of minors in—having consumed alcohol when he went back to the residence. And the defendant opened the gate, so he was on the premises with her implied consent. And when he got up to the front door and saw the other people, he realized he had to—he had a situation that needed investigating. I think that there were sufficient exigent circumstances to permit his entry into the home where the marijuana was in plain view.

The court denied the motion to suppress.

## Standard of Review

 In reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to the trial court's findings of historical fact that the record supports, especially when those findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). *But see Manzi v. State*, 88 S.W.3d 240, 243 (Tex.Crim.App. 2002) ("*Guzman* did not purport to hold that historical fact issues could be reviewed *de novo* if credibility and demeanor considerations were absent."). We afford the same amount of deference to the trial court's determination of mixed questions of law and fact, if the resolutions of those questions turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. When the trial court does not make explicit findings of historical fact, we review the evidence in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000). We review *de novo* the trial court's application of the law of search and seizure. *Id.*

## Discussion

 A home is a "sacrosanct place" in search and seizure law. *State v. Steelman*, 16 S.W.3d 483, 488 (Tex.App.-Eastland 2000), *aff'd*, 93 S.W.3d 102 (Tex.Crim.App. 2002); *see also United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...."). Accordingly, searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *But see Hulit v. State*, 982 S.W.2d 431, 436 (Tex.Crim.App. 1998) ("Article I, Section 9 of the Texas Constitution contains no requirement that a seizure or search be authorized by a warrant...."). There is, however, an exception to the warrant requirement when exigent circumstances are present. To fit within this exception, an officer must have probable cause to search and there must be exigent circumstances that make procuring a warrant impracticable. *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002); *McNairy v. State*, 835 S.W.2d 101, 106 (Tex.Crim.App.1991).

 Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a person of reasonable prudence to believe that an instrumentality or evidence of a crime will be found. *McNairy*, 835 S.W.2d at 106. Facts that would be sufficient to establish probable cause for purposes of procuring a warrant are not necessarily sufficient to establish probable cause for a warrantless search of a home. *See Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Johnson v. United States*, 333 U.S. 10, 13–

14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948); *State v. Steelman,* 93 S.W.3d 102, 110 (Tex.Crim.App.2002) (Cochran, J., concurring); *Barocio v. State,* 117 S.W.3d 19, 23, 2003 WL 21402504, at \*3 (Tex.App.-Houston [14th Dist.] June 19, 2003, no pet. h.) (plurality opinion).

Estrada argues that the facts of this case are similar to, and thus controlled by, the Texas Court of Criminal Appeals' decision in *Steelman.* We agree.

In *Steelman,* the police went to the home of Ian and Leo Steelman, acting on an anonymous tip that drug dealing was occurring at the home. When they knocked on the front door, Ian opened the door, and the officers smelled burnt marijuana. They asked Ian for identification, and he opened the door to retrieve his identification from inside the house. The officers prevented him from closing the door behind him and entered the home. *Steelman,* 93 S.W.3d at 104.

The Court of Criminal Appeals held that "a mere anonymous tip, standing alone, does not constitute probable cause." *Id.* at 108. The court also held that "[t]he odor of marijuana, standing alone, does not authorize a warrantless search and seizure in a home," and that "odors alone do not authorize a search without a warrant." *Id.* (internal quotation marks omitted). Accordingly, the court concluded that the anonymous tip and the smell of marijuana did not create probable cause to believe that Ian had committed an offense in the officers' presence. *Id.* at 109. Because the officers therefore had no authority to make a warrantless arrest, they also had no authority to make the warrantless entry and search of the home. *Id.*

Pursuant to *Steelman,* the evidence that Baladez smelled marijuana is not sufficient to justify the warrantless search of the home.[1] The State asserts, however, that this case is distinguishable from *Steelman* because Baladez not only smelled marijuana, he also saw it in plain view *before* he entered the house. The record does not support this assertion.

When the trial judge asked him when and why he entered the house, Baladez responded that he "stepped in" to see the people in the house "and that's when I saw the marijuana." This response clearly indicates that Baladez did not see the marijuana until after he went inside the house.[2] *See Payton,* 445 U.S. at 590, 100 S.Ct. at 1382 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the

---

**1.** In *Steelman,* the court noted that the officers merely smelled marijuana emanating from the house; they did not smell it on Ian himself. 93 S.W.3d at 108. This fact was relevant to one of the issues the court had to decide in *Steelman:* whether the officers had probable cause to believe that Ian had committed an offense in their presence and was thus subject to a warrantless arrest. *See id.* at 107–08. Because we are not concerned with a warrantless arrest in this case, the fact that Baladez smelled marijuana on Estrada, in addition to smelling it emanating from the house, does not contribute to the probable cause analysis.

**2.** We recognize that Baladez gave the prosecutor a slightly different account. He testified, "I stepped up on the door jam [sic]...."

And I looked down and I could see in the ashtray what appeared to be roaches...." The prosecutor followed up by asking, "So after you smelled the smoke and you made the observation from the door jam [sic], then you entered the residence at that point?" Baladez responded, "Yes." A "doorjamb" is "an upright piece forming the side of a door opening." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 375 (1986). Given this definition, we believe it would have been physically impossible for Baladez to have actually stepped on the doorjamb. *Cf. Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 712 (Tex.1997) (stating that a reviewing court need not accept an expert's testimony that the Earth is flat, Earth is the center of the solar system, or the moon is made of green cheese).

house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

In *Steelman*, as in this case, there was additional evidence, besides the smell of marijuana, that could arguably support probable cause. In *Steelman*, the additional evidence was the anonymous drug-dealing tip. Here, we have different evidence. To evaluate this evidence, we turn to the Supreme Court's decision in *Johnson*. The Court of Criminal Appeals relied on *Johnson* in *Steelman*. *See Steelman*, 93 S.W.3d at 108.

In *Johnson*, police officers smelled the odor of burning opium emanating from the defendant's hotel room. 333 U.S. at 12, 68 S.Ct. at 368. When they knocked on the door, a voice from inside asked who was there. One of the officers identified himself. After a "slight delay" and "some shuffling or noise," the defendant opened the door. *Id.*, 68 S.Ct. at 368 (internal quotation marks omitted). The Court noted that when the officers entered the hotel room, they had evidence that a neutral magistrate might have found to be probable cause for issuing a search warrant. *Id.* at 13, 68 S.Ct. at 368. Nevertheless, the officers' entry into the room was illegal because they had not secured such a warrant. *Id.* at 14–15, 68 S.Ct. at 369. The Court explained its reasoning this way:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination

to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Id.* at 13–14, 68 S.Ct. at 369 (footnotes omitted); *see also Steelman*, 93 S.W.3d at 112–13 (Cochran, J., concurring) (quoting from this passage); *Barocio*, 117 S.W.3d at 23 & n. 1, 2003 WL 21402504, at *3 & n. 1 (same).

As in *Johnson*, Estrada did not initially respond when Baladez identified himself and sought entry into the house. Also as in *Johnson*, Baladez heard people moving about inside the house. This evidence, combined with the smell of drugs, did not justify a warrantless entry in *Johnson* and it does not do so here. Although there was other evidence in this case that might raise an officer's suspicions, we conclude that the evidence does not rise to the level necessary to support a warrantless search of a home. *See Barocio*, 117 S.W.3d at 23–24, 2003 WL 21402504, at *1, 4 (holding, based on *Steelman* and *Johnson*, that evidence of the smell of marijuana emanating from a home, a car with an open door and the keys in the ignition in front of the home, and pry marks on the home's front door was not sufficient to justify a warrantless entry).

## Conclusion

For the reasons stated herein, we sustain Estrada's point of error, reverse her conviction, and remand this cause to the trial court for further proceedings consistent with this opinion.