COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 




 
 
  
 GINA MARIE
 ESTRADA,
  
                             Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                             Appellee.
 
 
  
 '
  
 '
  
 '
  
 '
  
 '
 
 
  
 No. 08-02-00366-CR
  
 Appeal from the
  
 County Court at Law
  
 of Ector County, Texas
  
 (TC#02-0267)
 
 




 

O
P I N I O N

Gina Marie Estrada pleaded guilty to
possession of two ounces or less of marijuana. 
The court sentenced her to three days in jail and ordered her to pay a
$350 fine.  On appeal, she argues that
the trial court erred by denying her motion to suppress.  We reverse and remand.

Factual Background

On the night in question, Estrada was
house-sitting at her grandmother=s house.   The house is in the midst of an eight-acre
area that has a fence around it.  The
driveway has a ranch-type gate across it. 
The house also has an enclosed front porch with two doors leading into
it from outside.








Raymond Baladez,
an Ector County deputy, responded to a complaint of loud music and Avehicles running up and down the road
at a high rate of speed@ near the Estrada house. 
Baladez testified that as he pulled up to the
house, he saw two people who appeared to be juveniles running away.  He found alcoholic beverages near where the
juveniles had been.  The gate was open.  He went up to the house, identified himself,
and banged on the door and a window several times, but got no response.  Although he could hear voices and Afootsteps of people running@ inside, he did not hear any
music.  He had his dispatcher call the
house in an attempt to make contact, but the line was busy.

Baladez then pulled his car out of the
driveway and parked it on the street. 
While he was waiting there, he was dispatched to a nearby area where an
anonymous caller had reported a disturbance involving gunshots.  When he responded to that call, he could not
find any evidence of a disturbance, so he returned to the Estrada house.  Baladez suspected
that someone at the Estrada house made the anonymous call so he or she could
leave while Baladez was gone.

When Baladez
returned to the Estrada house, he saw two vehicles leaving the house.  He pulled the vehicles over and smelled
alcohol and marijuana on the drivers.  
Both of the drivers were under twenty-one.  They told Baladez
that they had been drinking at the Estrada house.  He instructed the drivers to back their cars
into the driveway.  At that time, the
gate was closed.








Estrada testified that she heard Baladez advise one of the drivers
to Atell your friend to open the door,
because if she doesn=t y=all are going to jail.@ 
At that point, Estrada walked out of the house and met Baladez at the gate. 
According to Baladez, Estrada had the strong
odor of alcohol on her breath and the odor of marijuana on her clothes.  He testified that at that time it would have
been a Afair assumption@ that Estrada and the two drivers had
been smoking marijuana in the house. 
Nevertheless, he did not seek a search warrant then because he was Anot looking for marijuana at that
time.@  
Baladez asked Estrada if there were any other
people in the house.  She said that there
were, but she did not know how many.  Baladez also asked Estrada why she did not come to the door
when he knocked earlier.  He testified
that she stated she did not know he had been there.  His report of the incident stated that when
he asked Estrada why she did not answer the door A[s]he advised that they didn=t want to go to jail.@

According to Baladez,
Estrada Aopened the gate and turned around and
walked back towards the residence and [he] followed her.@  Baladez and Estrada
proceeded to walk through the open porch doors. 
Estrada opened the door to the house, and Baladez
smelled the odor of marijuana coming out of the house.  Baladez then called
for back-up to assist him and to Astand by while [he] cleared the rest
of the house.@

The prosecutor and Baladez engaged in the following colloquy regarding what
happened when Estrada opened the door to the house:

Prosecutor:    Did you observe anything when she opened the
door?

 








Baladez:          Yes, I
could look inside.  There was off to the
right, there was a kitchen table and there were several--I stepped up on the
door jam [sic] and because she was--she was calling everybody out and there was
people coming out.  And for my safety I
wanted to keep them in my sights.  And I
looked down and I could see in the ashtray what appeared to be roaches[,] which were used marijuana cigarettes.

 

Prosecutor:    Okay.  So after you smelled the smoke and you made
the observation from the door jam [sic], then you entered the residence at that
point?

 

Baladez:          Yes.

When the trial court attempted to
clarify Baladez=s testimony, the following exchange
occurred:

The Court:      All
right.  I want to make sure I am clear on
this.  You=re
standing at the gate and did you say the defendant opened the gate?

 

Baladez:          Yes.

 

The Court:      And
then you and she were walking down the sidewalk talking.

 

Baladez:          Yes.

 

The Court:      And
she entered the residence?

 

Baladez:          Correct.

 

The Court:      Did
you go in with her?

 

Baladez:          No, I
was standing at the door while she was calling everybody to her.

 

The Court:      All
right.  And then tell me, at what point
and why you decided to enter the residence?

 








Baladez:          Because
I could smell the alcohol [sic].  There
were several individuals in the residence and I didn=t know if they were going to have weapons or not so I
stepped in where I could see them and that=s when I
saw the marijuana.

 

Baladez walked through the residence and
observed marijuana in other places.  No
weapons were found in the house or on the six people inside the house.

Baladez testified that it would have taken
at least three hours to get a search warrant, while it would have taken less
than a minute to dispose of the marijuana in the house.  He believed that if he had left, the people
at the house would have disposed of the marijuana.  The prosecutor asked Baladez,
ASo based on that exigent
circumstance, you entered the home in order to confiscate that marijuana before
it could be destroyed, correct?@  Baladez
responded, ACorrect.@

At the conclusion of the suppression
hearing, the trial court stated:

Well, the officer had evidence of minors in--having
consumed alcohol when he went back to the residence.  And the defendant opened the gate, so he was
on the premises with her implied consent. 
And when he got up to the front door and saw the other people, he
realized he had to--he had a situation that needed investigating.  I think that there were sufficient exigent
circumstances to permit his entry into the home where the marijuana was in
plain view.

 

The court denied the motion to suppress.

Standard of Review








In reviewing a trial court=s ruling on a motion to suppress, we
afford almost total deference to the trial court=s findings of historical fact that
the record supports, especially when those findings are based on an evaluation
of credibility and demeanor.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  But see Manzi v. State, 88 S.W.3d 240, 243 (Tex. Crim. App. 2002) (AGuzman did not purport to hold that
historical fact issues could be reviewed de novo if credibility and
demeanor considerations were absent.@). 
We afford the same amount of deference to the trial court=s determination of mixed questions of
law and fact, if the resolutions of those questions turn on an evaluation of
credibility and demeanor.  Guzman,
955 S.W.2d at 89. 
When the trial court does not make explicit findings of historical fact,
we review the evidence in the light most favorable to the trial court=s ruling.  Carmouche v. State, 10 S.W.3d 323, 327-28 (Tex. Crim.
App. 2000).  We review de novo
the trial court=s application of the law of search and seizure.  Id.

Discussion








A home is a Asacrosanct place@ in search and seizure law.  State v. Steelman,
16 S.W.3d 483, 488 (Tex. App.--Eastland 2000), aff=d, 93 S.W.3d 102 (Tex. Crim.
App. 2002); see also United States v. United States Dist. Court, 407
U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752
(1972) (A[P]hysical
entry of the home is the chief evil against which the wording of the Fourth
Amendment is directed . . . .@).  Accordingly,
searches and seizures inside a home without a warrant are presumptively
unreasonable.  Payton
v. New York,
445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d
639 (1980).  But see
Hulit v. State, 982 S.W.2d 431, 436
(Tex. Crim. App. 1998) (AArticle I, Section 9 of the Texas
Constitution contains no requirement that a seizure or search be authorized by
a warrant . . . .@).  There is, however,
an exception to the warrant requirement when exigent circumstances are
present.  To fit within this exception,
an officer must have probable cause to search and there must be exigent
circumstances that make procuring a warrant impracticable.  Kirk v. Louisiana,
536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d
599 (2002); McNairy v. State, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991).

Probable cause to search exists when
reasonably trustworthy facts and circumstances within the knowledge of the
officer on the scene would lead a person of reasonable prudence to believe that
an instrumentality or evidence of a crime will be found.  McNairy, 835 S.W.2d
at 106.  Facts that would be
sufficient to establish probable cause for purposes of procuring a warrant are
not necessarily sufficient to establish probable cause for a warrantless search of a home.  See Aguilar v. Texas, 378 U.S. 108,
111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964), abrogated
on other grounds by Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Johnson v. United
States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 368-69,
92 L.Ed.2d 436 (1948); State v. Steelman, 93
S.W.3d 102, 110 (Tex. Crim. App. 2002) (Cochran, J.,
concurring); Barocio v. State, ___
S.W.3d ___, ___, 2003 WL 21402504, at *3 (Tex. App.--Houston [14th Dist.] June 19, 2003, no pet. h.) (plurality opinion).

Estrada argues that the facts of this
case are similar to, and thus controlled by, the Texas Court of Criminal
Appeals= decision in Steelman.  We agree.








In Steelman,
the police went to the home of Ian and Leo Steelman,
acting on an anonymous tip that drug dealing was occurring at the home.  When they knocked on the front door, Ian
opened the door, and the officers smelled burnt marijuana.  They asked Ian for identification, and he
opened the door to retrieve his identification from inside the house.  The officers prevented him from closing the
door behind him and entered the home.  Steelman, 93 S.W.3d at 104.

The Court of Criminal Appeals held
that Aa mere anonymous tip, standing alone,
does not constitute probable cause.@ 
Id. at 108.  The court also held that A[t]he odor of marijuana, standing
alone, does not authorize a warrantless search and
seizure in a home,@ and that Aodors alone do not authorize a search without a warrant.@ 
Id. (internal quotation marks omitted).  Accordingly, the court concluded that the
anonymous tip and the smell of marijuana did not create probable cause to
believe that Ian had committed an offense in the officers= presence.  Id. at 109.  Because the officers therefore had no
authority to make a warrantless arrest, they also had
no authority to make the warrantless entry and search
of the home.  Id.








Pursuant to Steelman,
the evidence that Baladez smelled marijuana is not
sufficient to justify the warrantless search of the
home.[1]  The State asserts, however, that this case is
distinguishable from Steelman because Baladez not only smelled marijuana,
he also saw it in plain view before he entered the house.  The record does not support this assertion.

When the trial judge asked him when
and why he entered the house, Baladez responded that
he Astepped in@ to see the people in the house Aand that=s when I saw the marijuana.@ 
This response clearly indicates that Baladez
did not see the marijuana until after he went inside the house.[2]  See Payton, 445 U.S.
at 590, 100 S.Ct. at 1382 (A[T]he
Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold
may not reasonably be crossed without a warrant.@).

In Steelman,
as in this case, there was additional evidence, besides the smell of marijuana, that could arguably support probable cause.  In Steelman,
the additional evidence was the anonymous drug-dealing tip.  Here, we have different evidence.  To evaluate this evidence, we turn to the
Supreme Court=s decision in Johnson.  The Court of Criminal Appeals relied on Johnson
in Steelman. 
See Steelman, 93
S.W.3d at 108.








In Johnson, police officers
smelled the odor of burning opium emanating from the defendant=s hotel room.  333 U.S. at 12, 68 S.Ct.
at 368.  When they knocked on the door, a
voice from inside asked who was there.  One of the officers identified himself.  After a Aslight delay@ and Asome shuffling or noise,@ the defendant opened the door.  Id., 68 S.Ct. at 368 (internal quotation marks omitted).  The Court noted that when the officers
entered the hotel room, they had evidence that a neutral magistrate might have
found to be probable cause for issuing a search warrant.  Id. at 13, 68 S.Ct.
at 368.  Nevertheless, the officers= entry into the room was illegal because they had not secured
such a warrant.  Id.
at 14-15, 68 S.Ct. at 369.  The Court explained its reasoning this way:

The point of the Fourth Amendment, which often is not
grasped by zealous officers, is not that it denies law enforcement the support
of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that
those inferences be drawn by a neutral and detached magistrate instead of being
judged by the officer engaged in the often competitive enterprise of ferreting
out crime.  Any assumption that evidence
sufficient to support a magistrate=s
disinterested determination to issue a search warrant will justify the officers
in making a search without a warrant would reduce the Amendment to a nullity
and leave the people=s homes secure only in the discretion of police
officers.  Crime, even in the privacy of
one=s own quarters, is, of course, of grave concern to
society, and the law allows such crime to be reached on proper showing.  The right of officers to thrust themselves
into a home is also a grave concern, not only to the individual but to a
society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of privacy must reasonably
yield to the right of search is, as a rule, to be decided by a judicial
officer, not by a policeman or Government enforcement agent.

 

Id.
at 13-14, 68 S.Ct. at 369 (footnotes omitted); see
also Steelman, 93 S.W.3d at 112-13 (Cochran, J.,
concurring) (quoting from this passage); Barocio,
___ S.W.3d at ___ & n.1, 2003 WL 21402504, at *3 & n.1 (same).








As in Johnson, Estrada did not
initially respond when Baladez identified himself and
sought entry into the house.  Also as in Johnson,
Baladez heard people moving about inside the
house.  This evidence, combined with the
smell of drugs, did not justify a warrantless entry
in Johnson and it does not do so here. 
Although there was other evidence in this case that might raise an
officer=s suspicions, we conclude that the
evidence does not rise to the level necessary to support a warrantless
search of a home.  See Barocio, ___ S.W.3d at ___, 2003 WL 21402504, at *1, 4
(holding, based on Steelman and Johnson,
that evidence of the smell of marijuana emanating from a home, a car with an
open door and the keys in the ignition in front of the home, and pry marks on
the home=s front door was not sufficient to
justify a warrantless entry).

Conclusion

For the reasons stated herein, we
sustain Estrada=s point of error, reverse her conviction, and remand this
cause to the trial court for further proceedings consistent with this opinion.

 

SUSAN
LARSEN, Justice

August 28, 2003

 

Before Panel No. 4

Barajas, C.J., Larsen, and
McClure, JJ.

 

(Publish)











[1]In
Steelman, the court noted that the officers
merely smelled marijuana emanating from the house; they did not smell it on Ian
himself.  93 S.W.3d at
108.  This fact was relevant to
one of the issues the court had to decide in Steelman:  whether the officers had probable cause to
believe that Ian had committed an offense in their presence and was thus
subject to a warrantless arrest.  See id. at
107-08.  Because we are not concerned
with a warrantless arrest in this case, the fact that
Baladez smelled marijuana on Estrada, in addition to
smelling it emanating from the house, does not contribute to the probable cause
analysis.





[2]We
recognize that Baladez gave the prosecutor a slightly
different account.  He testified, AI
stepped up on the door jam [sic] . . . . 
And I looked down and I could see in the ashtray what appeared to be
roaches . . . .@  The prosecutor followed up by asking, ASo after you
smelled the smoke and you made the observation from the door jam [sic], then
you entered the residence at that point?@  Baladez responded, AYes.@ 
A Adoorjamb@ is Aan
upright piece forming the side of a door opening.@  Webster=s Ninth New Collegiate Dictionary 375
(1986).  Given this definition, we
believe it would have been physically impossible for Baladez
to have actually stepped on the doorjamb. 
Cf. Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 712 (Tex. 1997) (stating that a
reviewing court need not accept an expert=s
testimony that the Earth is flat, Earth is the center of the solar system, or
the moon is made of green cheese).